Nidia **BARCIA**, et al., Plaintiffs,

v.

Louis **SITKIN**, et al., Defendants.

**MUNICIPAL LABOR COMMITTEE,**
et al., Plaintiffs,

v.

Louis **SITKIN**, et al., Defendants.

Nos. 79 Civ. 5831 (RLC), 79 Civ. 5899 (RLC).

United States District Court,
S.D. New York.

March 11, 1988.

Raff & Becker, New York City, for plaintiffs; Robert L. Becker, of counsel.

Robert Abrams, Atty. Gen. of the State of New York, New York City, for defendants; Judith A. Gordon, Asst. Atty. Gen., of counsel.

CORRECTED OPINION

ROBERT L. CARTER, District Judge.

The issue before the court is the reasonable hourly rate for services performed by Beverly Gross and David Raff for the period June 1, 1979, to June 30, 1983, as an award of attorneys' fees pursuant to 42 U.S.C. § 1988. The parties had agreed to an interim hourly rate for Gross and Raff of $165 with the final hourly rate to be determined by the court. It was agreed that the interim rate could be adjusted up or down.

Plaintiffs seek an across-the-board hourly rate of $185, an enhancement factor for delay in payment from October 5, 1982, to March 4, 1985, interest on the balance of the amount due, a 25% enhancement factor to Raff for exceptional quality of the litigation, an additional 25% enhancement to Raff for the contingent nature of the case, and an award of attorneys' fees and costs to plaintiffs in connection with the application. Plaintiffs' Notice of Motion at 1.

The state contends that the interim rate is too high and that the reasonable hourly rate should be set as follows: for the period June 1, 1979, to June 30, 1982, no more than $90 for Gross and not in excess of $120 for Raff; and for the period July 1, 1982, to June 30, 1983, no more than $110 for Gross and not in excess of $140 for Raff. Defendants' Memorandum of Law at 31–33. Although it is not made entirely clear, the state's lower figure for Gross is based on plaintiffs' failure to describe Gross's services. *Id.* at 37.

Since the time the parties submitted this issue to the court, the United States Supreme Court has decided *Pennsylvania v.* *Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986),[1] and that decision would seem to govern disposition of most of the issues raised in this fee application.

The parties have agreed on the number of hours involved. Thus the hourly rate and questions of enhancement are the only matters before the court.

These cases involve challenges to the practices and procedures of the New York State Unemployment Insurance Appeal Board ("Appeal Board"). The first of these cases, *Moore v. Ross,* 79 Civ. 1825, challenging the constitutionality of these procedures, was filed on April 6, 1979. Raff was not involved in the *Moore* case. On October 26, 1979, *Barcia v. Sitkin,* 79 Civ. 5831, was filed raising substantially the same issues as the *Moore* case and additionally challenging the lack of Spanish-speaking interpreters and translators in hearings involving Spanish-speaking claimants for unemployment insurance. *Barcia* was filed as a case related to *Moore* and was assigned to my calendar. In *Barcia,* Robert W. Becker, Esq., subsequently Raff's law partner, was listed as counsel. *Municipal Labor Committee v. Sitkin,* 79 Civ. 5899, was filed on November 1, 1979. Raff was listed as counsel in that case. It was filed as a case related to *Moore* and assigned to my calendar. Then *Espinoza v. Sitkin* was filed on February 9, 1981, and plaintiffs intervened in *Barcia,* representing a subclass of Spanish-speaking appellants. Finally, *New York State United Teachers v. Sitkin* was filed on March 26, 1981. This latter case challenged the Appeal Board's interpretation of § 590.10 of the New York Labor Law as effectively depriving teacher claimants of unemployment compensation. Plaintiffs in *United Teachers* intervened in *Municipal Labor.* Plaintiffs in all the cases sought class action certification to proceed on behalf of a class or subclass of unsuccessful claimants for unemployment insurance.

---

**1.** *Delaware Valley* arose under section 304 of the Clean Air Act, 42 U.S.C. § 7604. The Court held, however, that "purposes behind § 304 and § 1988 are nearly identical...." *Id.* 106 S.Ct. at 3095.

In February, 1980, a motion for summary judgment was filed in *Moore v. Ross*. On the theory that disposition of the summary judgment motion in the *Moore* case would materially affect the course of proceedings and outcomes in the other pending *Barcia* and *Municipal Labor Committee* cases, the court ordered discovery in the later cases to proceed while the summary judgment motion in *Moore* was under advisement.

The summary judgment motion in *Moore v. Ross* was decided on December 5, 1980, in a published opinion, 502 F.Supp. 543 (S.D.N.Y.1980) (Carter, J.), *aff'd*, 687 F.2d 604 (2d Cir.1982), *cert. denied*, 459 U.S. 1115, 103 S.Ct. 750, 74 L.Ed.2d 969 (1983), with which familiarity is assumed.

Although the court had granted summary judgment in favor of the defendants, summary judgment motions in *Barcia* and *Municipal Labor* were denied on February 1, 1981, because the claimed lack of Spanish-speaking interpreters and translators and the Board's pro forma finding of reasonable assurance of employment without there actually having been such reasonable assurance were held to raise issues of disputed facts, resolution of which required a trial. On March 26, 1981, *Barcia* and *Municipal Labor* were consolidated on the court's calendar for all purposes.

Plaintiffs thereafter were granted access to 3,000 randomly selected unemployment compensation cases over a three-year period extending from June 21, 1977 through June 30, 1980. These cases were chosen from among some 60,700 decided cases, and for approximately one year, counsel, assisted by law students, examined and analyzed these cases. Raff organized, directed and oversaw this year-long examination and analysis.

Early in 1982, settlement negotiations began in earnest. On March 1, 1983, a proposed settlement was submitted to the court, providing for notices to be sent to the class, with a settlement hearing being scheduled on June 6, 1983. The hearing was held and the settlement was approved by the court in an opinion filed on July 29, 1983, with an amended opinion being filed on September 14, 1983.

The settlement clarifies the procedures to be followed at each stage of unemployment compensation proceedings and mandates expeditious adjudication, clear articulation of the bases for denial of benefits at each stage of the proceedings, and in the decisions of the Administrative Law Judges and Appeals Board the promulgation of a concise statement of the facts relied on.

After the settlement was reached, negotiations proceeded on the issue of attorneys' fees. Partial agreement was reached in this matter, except for the issues raised in the present application. On October 5, 1983, plaintiffs submitted their first written proposal to settle their claims for interim attorneys' fees. Plaintiffs assert that after submission of their proposal on October 5, 1983, defendants refused to negotiate "until the Supreme Court rendered a decision in *Blum v. Stenson*," 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), which was decided on March 21, 1984. Affidavit of David Raff in Support of the Application for Interim Fees at 45–46. Plaintiffs go on to state that no face-to-face meeting between plaintiffs and defendants took place until July 9, 1984; that plaintiffs supplied market hourly rate data to defendants to substantiate the proposed hourly rates, and that defendants offered no data nor questioned the legitimacy of plaintiffs' data but merely claimed the requested rates were too high. *Id.* at 46. The agreement, plaintiffs argue, reached on March 4, 1985, on hourly rates was "almost identical to [that] proposed by plaintiffs in October, 1985." *Id.* Plaintiffs assert that there was no valid reason for defendants' delay in reaching agreement on the hourly rates. Plaintiffs claim the delay injured them in that inflation reduced the value of the money ultimately received and prevented them from earning income on the money they should have received. The state contends that during the period of October, 1983, to March, 1985, it was awaiting the Supreme Court decision in *Blum* and was seeking to negotiate with plaintiffs for settlement at lower hourly rates than had been proposed.

Raff at some point became lead counsel in *Barcia* and the other cases pending before the court after *Moore* had been disposed of. While most of the time spent by applicants was in out-of-court matters (analyzing the selected cases, and negotiating with state officials), the applicants are entitled to reasonable compensation for these services since these activities are within the "zone of discretion" afforded the court. *Delaware Valley, supra,* 478 U.S. at 561, 106 S.Ct. at 3096. However, the state's contention that services not involving court activity warrant compensation at a lower rate than those that do involve court activity is not as unreasonable as Raff seems to believe. This differential in rates is built into the compensation afforded under the Criminal Justice Act, 18 U.S.C. § 3006A. *See also* N.Y.County Law § 722–b (McKinney's Supp.1988). However, in civil litigation a lawyer's time is compensated at the same rate whether for in-court or out-of-court activity.

Throughout most of this litigation, except for papers filed in connection with the summary judgment motions, the matters raised both in and out of court concerned the content of the settlement agreement and what should be set out in writing concerning the procedures to be followed in the processing and hearing of claims for unemployment insurance. In short, the same type of activity took place whether in or out of court. Thus, differentiation cannot be made. Moreover, the state has already agreed on a total number of hours that it will pay for. Those hours have not been divided into in-court and out-of-court totals, nor have they been grouped by the year in which they were performed. Thus, even if differentiation between in-court and out-of-court activity could be made, such hourly allocation would not be feasible.

There is not much to be gleaned from Beverly Gross's terse resume. She is a 1968 graduate of New York University Law School. Her employment following graduation from law school seems to be chiefly administrative: Assistant Corporation Counsel; then Deputy General Counsel, New York City Commission on Human Rights; then Chief, Civil Rights Unit, Corporation Counsel's Office; then General Counsel, New York State Division of Human Rights; then General Counsel, District Council 37. The resume lists no cases that she handled and, for all that can be gathered from the resume, this could have been her first litigation experience. If she does have court experience, she did not display it in this case, inasmuch as I cannot recall her making an appearance in any of the hearings held before the court. At the very beginning of the litigation, matters of legal substance were discussed, but subsequent to the adjudication of the *Moore* summary judgment motion until the settlement hearing, the court sessions concerned only the progress of settlement discussions. There is nothing in Gross's resume or in anything on the record indicative of her work, ability or experience as a litigator. I cannot even assume litigation or court experience as an assistant corporation counsel, since her tasks could have encompassed only administrative duties.

When this case started, Raff was not an experienced litigator. After plaintiffs gained access to the 3,000 Appeals Board determinations, Raff became the dominant lawyer on plaintiffs' side. Moreover, with his involvement in this case, his court experience has widely expanded. He ultimately assumed the role of lead counsel, but in the context of the development of these cases, that title has a grander sound than substance. There was no trial, and there were only a limited number of hearings dealing with substantive legal issues. He carried the burden of negotiating the settlement, analyzing the cases to which plaintiffs had access, and drafting the settlement agreement. These are some of the functions of a lead counsel, but the more essential functions include the development of trial strategy, coordination of the activities of lawyers during trial, division of work among various lawyers for both pretrial preparation and trial itself, and serving as principal spokesman before the court for the class on all matters of importance during the trial. Most of these functions Raff did not perform because the litigation never reached the stage when such functions

come into play. Since these non-performed matters are really the essence of a lead counsel's role, the title in this case does not carry the weight ordinarily attributable to it.

█ It is clear that counsel seeking attorneys' fees under § 1988 are entitled to marketplace rates, and the fees awarded are to be governed by the same standards that prevail in other types of litigation. *Blum v. Stenson*, 465 U.S. 886, 893–94, 104 S.Ct. 1541, 1546, 79 L.Ed.2d 891 (1984). Raff and Gross, therefore, are entitled to reasonable hourly rates calculated in accordance with prevailing marketplace rates in the New York community that lawyers of similar experience and reputation can command for work performed in similar litigation. If Gross and Raff had a schedule of fees charged for services in previous or other cases, we could look to those fees to decide on reasonable rates in this case. Neither was engaged in private practice during the relevant period, 1979–1983, and there is no schedule of fees for their services in previous cases. Thus, we look to the prevailing rates in New York for a 1968 law graduate during the period 1979–1983.

In another case and another connection, the court had occasion to canvass the hourly rates that could be applied to a 1969 law graduate of Columbia University Law School who had specialized since graduation in the type of litigation for which fee was being sought. My conclusion was that lawyers in the class of 1969 could command $125 per hour in 1978–1980, $165 per hour in 1981 and 1982, $185 per hour in 1983, and in excess of $200 in 1984 and thereafter.

Thus for two years the interim $165 per hour paid was $40 per hour in excess of what an experienced litigation member of the 1969 class could command. For two years the $165 rate was what could be commanded, still leaving it $30 per hour in excess of the composite rate for the four year period. For 1983 the interim rate was $25 less than historic marketplace rates.

Although Gross and Raff are 1968 law school graduates, neither had been in the continuous practice of law since gradua-

tion. In view of the lack of full-time litigation experience from 1968 to the relevant period, I believe it overly generous to Gross to equate her with the 1969 law graduate in continuous litigation since 1969. Raff is a 1968 graduate of Brooklyn Law School and he secured an L.L.M. in labor law two years later. While attending NYU Law School, he was counsel to the Workers' Defense League and the Association for Catholic Trade Unionists. From 1970 to 1979 he was a law professor at NYU and did not actively do litigation on a full-time basis until after his involvement in this case. However, by 1980 Raff had gained sufficient litigation experience to command marketplace rates equivalent to that of an 1968 law graduate with extensive litigation experience.

Thus while it might be fair to apply historic rates for a 1969 law graduate, rather than a 1968 law graduate, for 1979, Raff would thereafter command the rates of members of his class. Thus in 1980 he would be entitled to compensation close to the requested $185 per hour. In 1981 he would be entitled to compensation at that rate, and thereafter at a considerably higher rate.

█ Since the agreement on the number of hours spent is an across-the-board agreement of an aggregate number of hours for the entire period in question, a single rate for the period seems indicated. The 1979 and 1980 rates below $185 are balanced off against the 1982 and 1983 rates in excess of $185. Accordingly, compensating Raff at the rate of $185 per hour for the entire period seems fair.

█ As for Gross, however, the historic rates do not appear to be applicable. On the basis of the record before me, a $165 across-the-board rate for Gross would be excessive. Since I am limited to an across-the-board rate for the entire period, and Gross appears to be lacking in the litigation experience which would warrant classifying her with the 1969 law graduate with extensive litigation experience, I am setting Gross's rate at $140 per hour as fair compensation for her services.

**358**

■ Raff seeks to have his fee awarded a 50% increase to take into account exceptional quality of the work he did, for the success achieved and for the contingent nature of the case.

Raff relies on the 12 factors listed in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974), as those to be considered in arriving at a fee, but the Court in *Hensley v. Eckerhart,* 461 U.S. 424, 434 n. 9, 103 S.Ct. 1933, 1940 n. 9, 76 L.Ed.2d 40 (1983), indicated that while the trial court could consider the factors cited in *Johnson,* "it should note that many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." In *Blum v. Stenson,* 465 U.S. 886, 897, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984), the Court stated when the claimed rate and number of hours are reasonable, "the resulting product is presumed to be the reasonable fee" which should be awarded. Most recently, in *Pennsylvania v. Delaware Valley Citizens' Council For Clean Air,* 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986), the Court seems to have concluded that the figure arrived at in calculating the number of reasonable hours multiplied by a reasonable hourly rate "includes most, if not all, of the relevant factors comprising a 'reasonable' attorney's fee." *Id.* 106 S.Ct. at 3098. The Court reasoned that when a lawyer takes on a case, "he obligates himself to perform to the best of his ability and to produce the best possible results commensurate with his skill and his client's interests." *Id.* Therefore, Justice White concluded, "it is unnecessary to enhance the fee for superior performance in order to serve the statutory purpose of enabling plaintiffs to secure legal assistance." *Id.* at 3098–99.

*Delaware Valley* seems to me to foreclose any upward adjustment for the contingency nature of the case or for exceptional success achieved. Both of these facts are included in the lodestar figure.

■ Plaintiffs seek an enhancement because of a delay by the state from October 31, 1983, to March 4, 1985, in settling the interim rates. Plaintiffs' first submission on interim rates was made on October 31, 1983. The state was not at risk on receipt of plaintiffs' proposals, that is, it was under no obligation to rush to agreement or be penalized. The state was apparently waiting for what it had reason to believe was a definitive decision from the United States Supreme Court. That decision was published on March 24, 1984. The period of October 31, 1983, to March 24, 1984, and a reasonable time thereafter is not a period in which a penalty may be attached to the state for not reaching accord. The state had the right, indeed even the duty, to await *Blum* before making an agreement with plaintiffs' attorneys about disbursements from the public fisc. Nor do I believe a penalty attaches for failure to come to agreement thereafter unless there is a showing of egregious bad faith. That the state reached a settlement close to the figures originally submitted by plaintiffs is not per se indicative of bad faith. The state officials had a right to negotiate the fee until agreement was reached. Whether bad faith was shown cannot be determined from the meager facts on this record. Plaintiffs assume bad faith because the long delay ended in agreement close to their initial submission. That assumption, however, without the facts to support such a conclusion, cannot be made by the court.

Plaintiffs are entitled to interest dating from March 5, 1985, on any amounts due under the interim agreement which have not been paid. Plaintiffs are also entitled to attorneys' fees for time spent on this application.

SETTLE ORDER.