**Shirley WILDER, et al., Plaintiffs,**

**v.**

**Blanche BERNSTEIN, individually and as Administrator of the New York City Human Resources Administration, et al., Defendants,**

**and**

**Abbott House, et al., Intervenors.**

**No. 78 Civ. 957(RJW).**

United States District Court, S.D. New York.

Dec. 4, 1989.

Polier, Tulin, Clark & Zalk (Stephen Wise Tulin, of counsel), Webster & Sheffield (Donald J. Cohn, Seth M. Lahn, Joseph M. Heppt, Sharon A. Lewis, of counsel), New York City, for intervenors.

Peter L. Zimroth, Corp. Counsel of the City of New York, Norma Kerlin, Asst. Corp. Counsel, New York City, for defendant New York City.

## OPINION

ROBERT J. WARD, District Judge.

Once again the Court is asked to decide a controversy stemming from the litigation concerning the provision of child care services by New York City (the "City") to those children requiring placement in insti-

tutions and foster homes. The litigation, which at its core revolves around the best interests of the children in the City's child care system, has occupied the courts of this Circuit for the past sixteen years, generating four published opinions prior to this decision.[1] The main protagonists in this ongoing saga are (1) plaintiffs, who represent a class of black Protestant children in need of child care services out of their home, (2) the City and the municipal officials responsible for the City's child care system (collectively the "City defendants"), (3) a group of nineteen private child care agencies which intervened in this action (the "intervenors") and (4) a group of administrators of private, religiously affiliated, child care agencies (the "sectarian agencies"). This decision will revisit the history of this litigation in the context of the intervenors' motion for an award of attorneys' fees and costs against the City, pursuant to 42 U.S.C. § 1988. The City has cross-moved to dismiss the intervenors'

application for fees.[2] For the reasons that follow, the intervenors' motion is granted and the City's cross-motion is denied.

## BACKGROUND

Plaintiffs challenged the City's child care system on several constitutional grounds, their final complaint alleging, in essence, that the child care system (1) operated to discriminate against children based on race and religion, (2) amounted to the establishment of religion and, (3) unduly burdened the free exercise rights of Protestant children. They also claimed that defendants had denied the plaintiff class equal access to child care services in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and applicable state law.

The intervenors represent a broad spectrum of foster care clinicians and administrators who together care for approximately 4,600 children.[3] A number of the inter-

---

**1.** These decisions are: *Wilder v. Sugarman,* 385 F.Supp. 1013 (S.D.N.Y.1974) (per curiam) (three-judge panel upheld facial constitutionality of New York State's constitutional and statutory provisions authorizing religious matching for publicly-funded foster care of children); *Wilder v. Bernstein,* 499 F.Supp. 980 (S.D.N.Y. 1980) (plaintiff class certification granted, remaining facial attacks on the validity of New York statutes dismissed); *Wilder v. Bernstein,* 645 F.Supp. 1292 (S.D.N.Y.1986) (approval of stipulation of settlement) (hereinafter *"Wilder III"*), *aff'd,* 848 F.2d 1338 (2d Cir.1988) (approval of consent decree upheld on appeal taken by sectarian agencies) (hereinafter *"Wilder IV"*).

The history of this litigation has been detailed in *Wilder III* and *Wilder IV,* familiarity with which is presumed, and the Court will not undertake an unnecessary repetition of this chronology.

**2.** A host of motions were initially filed with the Court regarding the entitlement of various parties to attorneys' fees. Plaintiffs filed motions for attorneys' fees and costs pursuant to 42 U.S.C. § 1988 against the City defendants, the sectarian agencies, the intervenors and Lester Kaufman, individually, and as Executive Director of Ohel Children's Home ("Kaufman"). In response, the intervenors filed a motion for sanctions against plaintiffs, pursuant to Rule 11, Fed.R.Civ.P. The intervenors also filed their own motion for attorneys' fees and costs against the City. The City then cross-moved to dismiss the intervenors' application.

On or about June 26, 1989, the City defendants submitted an offer of judgment to plain-

tiffs, pursuant to Rule 68, Fed.R.Civ.P., in the amount of $1,775,000.00, covering all of plaintiffs' claims for attorneys' fees and costs, except those incurred in the appeals from this Court's decision approving the Stipulation. Plaintiffs accepted the offer of judgment on or about June 27, 1989. A conference was held before the Court on July 21, 1989 to discuss the remaining motions. Pursuant to stipulation, so ordered August 9, 1989, plaintiffs withdrew their motions for attorneys' fees and costs against the intervenors and the sectarian agencies, and the intervenors withdrew their Rule 11 motion against plaintiffs.

Plaintiffs' application for attorneys' fees against Kaufman was withdrawn with prejudice pursuant to stipulation filed in April 1989. A subsequent motion by plaintiffs for attorneys' fees and costs against Kaufman, pursuant to Rule 37(b), was also withdrawn with prejudice by stipulation filed in June 1989. Only the intervenors' motion for fees and the City's cross-motion to dismiss remain.

**3.** The nineteen not-for-profit child care agencies which comprise the intervenors are: Abbott House, Berkshire Farm Center & Services for Children, Brooklyn Home for Children, Brookwood Child Care, The Children's Aid Society, The Children's Village, Episcopal Mission Society, Green Chimneys Children's Service, Heartsease Home, Inwood House, Lakeside School, Louise Wise Services, Lutheran Community Services, Puerto Rican Family Association, St. Christopher–Jennie Clarkson Child Care Services, Sheltering Arms Children's Service, Society for Seamen's Children, Spence–Chapin Services

venors were originally named as defendants in the *Wilder* litigation, but, by 1978, these defendants had all been dismissed from the case, many with prejudice.

Shortly before trial was to begin in August 1983, plaintiffs and the City defendants renewed their efforts at settlement. These negotiations proved fruitful and resulted in plaintiffs and the City defendants fashioning a draft stipulation of settlement. In or about January 1984, fourteen of the eventual intervenors, plus a number of other agencies, wrote the City expressing strong objections to the draft stipulation of settlement. The intervenors articulated their concerns with the draft stipulation to the Court and to the parties throughout the winter and early spring of 1984.

In April 1984, plaintiffs and the City defendants presented a proposed stipulation of settlement to the Court for approval. The Court then directed that notice of the proposed settlement be given to members of the plaintiff class. The intervenors, whose concerns with the draft had not been addressed in the proposed stipulation, continued to press their objections. They maintained that the proposed stipulation was fundamentally flawed because, *inter alia,* (1) it failed to protect the best interests of the children, (2) it unconstitutionally discriminated against children whose parents exercised a religious preference in child care, and (3) it failed to take into account the complex problems presented by the placement of children and the practical limitations inherent in the child care system. The intervenors were granted leave to intervene to oppose the proposed stipulation by order of the Court filed June 15, 1984.

The objections the intervenors presented to the Court concerning the proposed stipulation were comprehensive, and were supported by detailed affidavits from child care professionals. The affidavits and supporting materials presented by the intervenors provided the Court and the parties with important background and insight on the clinical and administrative realities confronting the child care system. Negotia-

tions concerning the content of the proposed stipulation, in which the intervenors played an integral role, continued throughout the summer. Beginning on August 6, 1984, the Court commenced a hearing on the fairness, reasonableness and adequacy of the settlement. As this Court noted in *Wilder III,* sparked primarily by the criticisms and suggestions of the intervenors, the parties embarked on a series of meetings in open court to attempt to resolve the numerous legal and child care issues involved with the proposed stipulation of settlement. The intervenors reached agreement on certain general topics with plaintiffs and the City defendants, and suggested specific changes that could be made in the original settlement agreement to resolve or mitigate many of the remaining problems they had identified in their original objections. The parties continued to negotiate around the various concrete proposals offered by the intervenors. These efforts proceeded throughout the fall of 1984 and, on January 2, 1985, a second proposed stipulation of settlement, supported by the intervenors, was submitted to the Court. The finalized version of the stipulation of settlement was ultimately approved by the Court in *Wilder III,* over the opposition of the sectarian agencies.

The significant impact the intervenors had on the ultimate Stipulation was detailed throughout the Court's decision in *Wilder III.* For example, it was noted that:

> The Intervenors' original comments proved extremely valuable to the Court, not only because they offered a fresh perspective on the day-to-day operation of New York City's child care system from the agency clinician's point of view ..., but because their criticism of the original settlement proposal was concrete, comprehensive and constructive.

*Wilder III,* 645 F.Supp. at 1346.

> The intervening agencies, as nonparties vis-a-vis the underlying constitutional claims in the lawsuit, are the sole participants in this litigation who have been in a position to address freely and undis-

to Children, and Talbot Perkins Children's Ser- vices.

tractedly the child care concerns that were prompted by the original settlement proposal. At the same time, their direct participation in the New York City foster care system, and their ongoing contact with the children in care, give them the ability and incentive to comment authoritatively on the likely impact of the settlement on agency administrators and clinicians and on the children they serve. The Court benefited immeasurably from the intervenors' initial insights into the operation of the child care system from the voluntary agency's perspective. The drafters of the original settlement undeniably benefited from the intervenors' constructive criticism and suggestions.

*Id.* at 1350.

More specifically, the Court found the contributions made by the Intervenors were essential to the creation of the final Stipulation.

> The settlement originally presented to the Court ... was clearly problematic.... The clinical concerns voiced by the intervenors and others raised serious questions in the Court's mind about both the extent to which child care issues had been fully explored ... and the extent to which the voluntary agencies had been allowed to participate meaningfully in the initial negotiations. The original settlement proposal therefore was unacceptable on several levels....
>
> The general outlines of the stipulation now before the court do not differ greatly from those of the original settlement.... Within this broad outline, however, the Stipulation reflects numerous changes—some minor, some substantial—that address virtually all of the concerns raised by the intervenors and other

child care administrators ... who commented on the original settlement.

*Id.* at 1347–48.

The intervenors worked to promote a more viable solution to the problems presented by the foster care system in New York, while at the same time assuring that the best interests of all children in the system were taken into account. They succeeded in forestalling entry of the proposed stipulation negotiated by plaintiffs and the City which did not satisfy their objections, and prevailed, through negotiations, in their proposals to modify the settlement to ameliorate the constitutional, clinical, and practical stumbling blocks they had identified in the original stipulation.[4] While the settlement was obviously the result of more than just the work of the intervenors, they played an essential role in forging the final version of the Stipulation which was acceptable to all the parties except the sectarian agencies, and approved by this Court and the Second Circuit.

Intervenors now seek to recover attorneys' fees and costs for their work in crafting and enforcing the Stipulation.

## DISCUSSION

Pursuant to the Civil Rights Attorneys' Fees Awards Act of 1976, a district court, in its discretion, may award attorneys' fees and costs to the prevailing party in any action or proceeding to enforce certain civil rights acts. 42 U.S.C. § 1988.[5] The parties do not dispute that section 1988 applies to this litigation.

A. *Entitlement to Fees—Intervenors as Prevailing Parties:*

██ The statutory language of section 1988 creates a presumption in favor of fee

---

**4.** *Wilder III* summarized twenty clinical concerns raised by intervenors to the first proposed settlement, and listed ten particularly noteworthy modifications of the settlement draft made to alleviate these concerns. *Wilder III* at 1346–49. In addition, many other points pressed by the intervenors resulted in modification of the proposed stipulation. *See* Affidavit of Stephen Wise Tulin, filed on March 20, 1989 at ¶ 24.

**5.** Section 1988 states, in pertinent part, that: In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–

318, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

Section 1988 has been interpreted in the same manner as the other fee-shifting provisions for particular civil rights claims which contain the "prevailing party" language. *See Independent Federation of Flight Attendants v. Zipes,* — U.S. ——, 109 S.Ct. 2732, 2735, n. 2, 105 L.Ed.2d 639 (1989).

awards, *Di Filippo v. Morizio,* 759 F.2d 231, 234 (2d Cir.1985), and a prevailing party is ordinarily entitled to recover fees and costs unless there are special circumstances which would render such an award unjust. *See Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968).

It is clear that a party may prevail for purposes of section 1988 through settlement. *Maher v. Gagne,* 448 U.S. 122, 129, 100 S.Ct. 2570, 2574, 65 L.Ed.2d 653 (1980) (consent decree which made no determination that the defendant had violated the plaintiff's constitutional rights was nonetheless sufficient to form the basis for a finding that the plaintiff was a prevailing party entitled to attorneys' fees). As noted in *Maher v. Gagne, supra,* 448 U.S. at 129, 100 S.Ct. at 2574, the Senate Report accompanying section 1988 stated that "for purposes of the award of counsel fees, parties may be considered to have prevailed when they vindicate rights through a consent judgment or without formally obtaining relief." Sen.Rep. No. 1011, 94th Cong., 2d Sess. 5 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin.News, 5908, 5912. Indeed, "congress made clear its concern that civil rights plaintiffs not be penalized for 'helping to lessen the docket congestion' by settling cases out of court." *Evans v. Jeff D.,* 475 U.S. 717, 733, 106 S.Ct. 1531, 1540, 89 L.Ed.2d 747 (1986) (holding that section 1988 does not bar the waiver of attorneys' fees as part of a settlement) (quoting *Marek v. Chesny,* 473 U.S. 1, 10, 105 S.Ct. 3012, 3017, 87 L.Ed.2d 1 (1985)).

The Supreme Court has recently explained that a party meets the threshold requirement necessary to be considered a prevailing party under section 1988 if he or she succeeds on "any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Texas State Teachers Assn. v. Garland*

*Independent School District,* —— U.S. ——, 109 S.Ct. 1486, 1493, 103 L.Ed.2d 866 (1989) (rejecting the "central issue" test for determining an award of attorneys' fees). *See also, Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983).

> The touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute.

*Texas State Teachers Assoc. v. Garland Independent School District, supra,* 109 S.Ct. at 1493.

■ The nature of much civil rights litigation does not lend itself to complete success by plaintiffs or defendants, and the input of intervenors may be necessary for a just remedy. While most of the cases dealing with the statutory award of attorneys' fees pursuant to section 1988 are concerned with awards to plaintiffs, an intervenor may also be a prevailing party entitled to fees and costs. *E.g. United States v. Board of Education of Waterbury,* 605 F.2d 573, 576 (2d Cir.1979).[6]

In *Waterbury,* an action concerning school desegregation, an organization comprised of parents and community leaders, along with several individuals, were allowed to intervene in the lawsuit after the defendants had been found liable, a consent decree had been filed and an initial desegregation plan was proposed by the defendants. Intervention was granted for the limited purpose of allowing the intervenors to protect the interests of the Hispanic community and to participate in the development of remedial measures under the consent decree. *Id.* at 574. Nonetheless, the intervenors were found to be prevailing parties, entitled to a fee award. *Id.* at 577.

The Second Circuit described the circumstances surrounding the intervention in *Waterbury* as follows:

> However, in the procedural posture of some cases the parties seeking to enforce such rights may be the defendants and/or defendant intervenors.

S.Rep. No. 1011, 94th Cong., 2d Sess. 4, *reprinted in* 1976 U.S.Code Cong. & Admin.News, 5908, 5912 n. 4.

---

6. An examination of the legislative history of section 1988 readily illustrates that Congress contemplated fee awards would be available to intervenors in certain circumstances.

> In the large majority of cases the party or parties seeking to enforce such rights will be the plaintiffs and/or plaintiff intervenors.

Intervenors entered this lawsuit to oppose a plan which unfairly burdened their constituency, and which was not being opposed by the government. In this they succeeded. They contested several later proposals, and worked in support of a plan which better served their valid interests. The remedy ultimately adopted bore a substantial resemblance to the plan intervenors supported (indeed it took the same general approach).... In light of the success of intervenors in these respects, we conclude that they come within the meaning of the term "prevailing party."

*Id.* The Second Circuit emphasized the importance of allowing intervenors to recover attorneys' fees when they further the purposes of the civil rights statutes by noting that:

[w]ere we to interpret "prevailing party" as meaning only the party which established the liability of the defendants, or the party which proposed the plan ultimately adopted, we would severely limit the availability of attorneys' fees to *parties whose participation contributed importantly to the creation of remedies* in these cases. We would discourage activity essential to the realization of the congressional purpose of combating discrimination.

*Id.* at 576–77. (emphasis added). *See also, Plummer v. Chemical Bank,* 592 F.Supp. 1168, 1171–72 (S.D.N.Y.1984) (intervenors who took active role in all facets of process, including participation in hearings in which they opposed a proposed settlement, and whose efforts ultimately resulted in a consent decree which represented a fairer document for the entire class, were prevailing parties for fee award); *Morgan v. McDonough,* 511 F.Supp. 408, 413–14 (D.C. Mass.1981) (intervening organization, which sought to vindicate the civil rights of its clients and made a significant contribu-

tion to the formulation of a workable remedy, was a prevailing party entitled to attorneys' fees).

██ The City does not dispute that the intervenors made important contributions to the final Stipulation, as clearly documented in *Wilder III,* but claim they are not entitled to fees because they never alleged a violation of their own constitutional rights. The City charges that the intervenors joined the litigation only to promote their own self-interests in eliminating paperwork, modifying the system of ranking agencies, and protecting their contractual rights with the City, and that these are not interests which should be compensated under section 1988.

It is clear that the purpose of the fee-shifting statute is to encourage the vindication of civil rights, and parties who are not involved in furthering such purposes should not be entitled to benefit from the statute. *See Russo v. New York,* 672 F.2d 1014, 1022–23 (2d Cir.1982) (plaintiff who lost on civil rights claim, but prevailed on similar state law claim, was not entitled to attorneys' fees under section 1988); *Gagne v. Enfield,* 734 F.2d 902, 904 (2d Cir.1984) (same).[7]

However, the City's contentions concerning the scope of the intervenors' participation in the litigation are not borne out by the record. The intervenors did more than just advance their own self-interests. Their participation furthered the purposes of the civil rights statutes by facilitating the formation of a settlement which would safeguard the constitutional rights of the children in the City's care, while assuring that the child care system itself would remain focused on the overall best interests of the children entitled to the protection of the civil rights laws. The contributions made by the intervenors were essential to the creation of a just and workable remedy, exactly the type of activity sought to be

---

**7.** *Cf Independent Federation of Flight Attendants v. Zipes, supra,* 109 S.Ct. at 2737, n. 4. In *Zipes* the Supreme Court held that attorneys' fees may be assessed against a blameless intervenor who was not found liable to plaintiff only if the intervenor's action was frivolous, unreasonable, or without foundation. *Id.* at 2736. In responding to the dissent, the majority noted that this heightened standard for the award of fees might not apply if the intervenor was an intermeddler who did not intervene to protect his or her own constitutional or statutory rights. *Id.* at 2737, n. 4.

promoted by the civil rights statutes. *See United States v. Board of Education of Waterbury, supra,* 605 F.2d at 577.

Furthermore, the intervenors consistently and forcefully articulated objections addressed to the constitutional and civil rights issues in this litigation. Their efforts helped to vindicate the civil rights of the children and families in the foster care system which they served, not just their own self interests. They succeeded in obtaining modifications in the initial settlement proposal on virtually every objection they raised, and many of these modifications went directly to benefit the children in the child care system. As a result of their labor, a "material alteration of the legal relationship of the parties in a manner which Congress sought to promote," *Texas State Teachers Assoc. v. Garland Independent School District, supra,* 109 S.Ct. at 1493, was effectuated. Accordingly, the Court concludes that the intervenors are prevailing parties under section 1988, entitled to an award of attorneys' fees and costs.[8]

### B. *The Amount of the Fee Award:*

The Supreme Court recently articulated the following summary of the legal standards for determining the amount of an appropriate fee award.

> A reasonable attorney's fee under § 1988 is one calculated on the basis of rates and practices prevailing in the relevant market, *i.e.*, "in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation," [*Blum v. Stenson,* 465 U.S. 886, 896, n. 11, 104 S.Ct. 1541, 1547, n. 11, 79 L.Ed.2d 891 (1984)], and one that grants the suc-

cessful civil rights plaintiff a "fully compensatory fee," [*Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983)], comparable to what is "traditional with attorneys compensated by a fee-paying client." S.Rep. No. 94–1011, p. 6 (1976), U.S.Code Cong. & Admin.News 1976, pp 5908, 5913.

*Missouri v. Jenkins,* —— U.S. ——, 109 S.Ct. 2463, 2470, 105 L.Ed.2d 229 (1989).

The framework for establishing the amount of an attorneys' fees award under the federal civil rights fee shifting statute is found in the lodestar approach. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 563–66, 106 S.Ct. 3088, 3097–99, 92 L.Ed.2d 439 (1986); *Hensley v. Eckerhart, supra,* 461 U.S. at 433, 103 S.Ct. at 1939. The lodestar amount is calculated by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate of compensation for each attorney involved. This calculation serves as a useful starting point for determining the amount of a reasonable fee, as it provides an objective basis on which to make an initial estimate of the value of a lawyer's services. *Hensley v. Eckerhart, supra,* 461 U.S. at 433, 103 S.Ct. at 1939.

The ultimate amount of the fee must be determined on the facts of each case, *id.* at 429, 103 S.Ct. at 1937, and the lodestar amount may be adjusted based on such factors as adequate documentation of hours spent, reasonableness of hours expended, and reasonableness of rate. *See Carrero v. New York City Housing Authority,* 685 F.Supp. 904, 906 (S.D.N.Y. 1988).[9] Once the applicant for a fee award

---

**8.** A prevailing party is entitled to attorneys' fees and costs unless special circumstances exist to make such an award unjust. *See Newman v. Piggie Park Enterprises, Inc., supra,* 390 U.S. at 402, 88 S.Ct. at 966. The City defendants assert that the acceptance by plaintiffs of their offer of judgment includes compensation to plaintiffs for costs associated with litigating against the intervenors and, therefore, any further award to the intervenors from the City would result in an impermissible windfall to the intervenors. This argument is misguided. There is no indication that plaintiffs have received compensation from

the City for time spent litigating against the intervenors. In any event, awarding a fair fee to the intervenors will not result in their retaining an impermissible windfall.

**9.** In calculating the lodestar, the following factors may be considered by the Court: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent;

has established the reasonableness of the claimed rate and the number of hours expended, the resulting lodestar figure is presumed to be the reasonable fee to which counsel is entitled. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, supra,* 478 U.S. at 564, 106 S.Ct. at 30; *Blum v. Stenson, supra,* 465 U.S. at 897, 104 S.Ct. at 15.

The intervenors seek (1) $416,052.50 in attorneys' fees relating to the substance of this litigation and an enhancement of this amount by a multiplier of 1.75 to $728,091.88; (2) $103,677.50 in attorneys' fees incurred in pursuing the fee application ("Fees for Fees"); and (3) $17,020.59 in costs. *See* Letter from Joseph M. Heppt dated November 13, 1989, filed November 27, 1989.[10] The City objects to this request on a number of grounds.

■ First, the City argues that the intervenors have failed to supply contemporaneous time records and therefore are not entitled to recover attorneys' fees.

All applications for attorney's fees, whether submitted by profit-making or non-profit lawyers, for any work done after the date of this opinion [June 15, 1983] should normally be disallowed unless accompanied by contemporaneous time records indicating, for each attorney, the date, the hours expended, and the nature of the work done.

*New York State Association for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1154 (2d Cir.1983). Contemporaneous time records are necessary so that the Court is not faced with an impossible task when asked to determine an appropriate fee amount, and lawyers are not required to expend even more time reconstructing the past in assembling the fee application. *Id.* at 1147–48. The burden to present such records to the Court rests squarely on the party requesting remuneration. *Hensley v. Eckerhart, supra,* 461 U.S. at 437, 103 S.Ct. at 19; *Carrero v. New York City Housing Authority, supra,* 685 F.Supp. at 909.

■ Intervenors submitted verbatim transcriptions of the daily entries made in the diaries of every attorney, paralegal and summer associate who worked on this case. Exhibit C annexed to Affidavit of Donald J. Cohn, filed September 15, 1989; Exhibit 7 annexed to Affidavit of Stephen Wise Tu-

(7) time limitations imposed by the client or the circumstances; (8) the amount of involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *See Hensley v. Eckerhart, supra,* 461 U.S. at 430, n. 3, 103 S.Ct. at 1938, n. 3; *United States Football League v. National Football League,* 887 F.2d 408 (2d Cir.1989).

10. Intervenors indicate that their total fee request amounts to $810,108.50. The City, however, maintains that if the intervenors were to receive full compensation for all the time they claim plus a multiplier of 1.75, the total fee request would be $834,756.61. Affidavit of Norma Kerlin, filed November 17, 1989 at ¶ 3, n. 1. The Court's own calculations, based on the latest figures presented in the intervenors' November 13, 1989 letter, indicate that the total fee request, exclusive of costs, amounts to $831,769.38.

This sum was calculated as follows:

| | | |
|---|---|---|
| 1. Opposition to the proposed stipulation and negotiating the final stipulation: | | $350,740.00 |
| 2. Defense of the Stipulation on appeal: | | $ 28,403.75 |
| 3. Enforcement of the Stipulation, including opposition to the initial City RFP: | | $ 36,908.75 |
| Total (excluding Fees for Fees) | | $416,052.50 |
| Total (excluding Fees for Fees) enhanced by a multiplier of 1.75: | | $728,091.88 |
| 5. Fees for Fees: | | |
| (a) Up to March 17, 1989: | $68,872.50 | |
| (b) From March 17, 1989 to November 13, 1989: | $34,805.00 | |
| | | $103,677.50 |
| Total Fee Request: | | $831,769.38 |

lin, filed September 1, 1989. The original diaries have not been presented to the Court.[11] Lead counsel for the intervenors, Donald J. Cohn ("Cohn") and Stephen Wise Tulin ("Tulin"), have attested to the fact that the documentation presented to the Court concerning the amount and the description of the time spent by the intervenors' attorneys consisted of the actual entries as they appeared in the daily diaries of the individuals in question, not summaries or reconstructions of these entries. Affidavit of Donald J. Cohn, filed September 15, 1989 at ¶¶ 5–7; Affidavit of Stephen Wise Tulin, filed September 1, 1989 at ¶ 8. *See also*, Affidavit of Joseph M. Heppt, filed September 1, 1989 at ¶ 7. Based on these assurances, the Court concludes that the intervenors have satisfied the requirement of producing contemporaneous billing records. *Cf. United States Football League v. National Football League*, 704 F.Supp. 474, 477 (S.D.N.Y.) (re-typed computer records satisfied contemporaneous time record requirement), *aff'd*, 887 F.2d 408, 415 (2d Cir.1989).

■ Second, the City argues that the intervenors are not entitled to enforce the Stipulation and, therefore, should be not be entitled to fees after December 19, 1985, when the executed consent decree was filed with the Court. The Court disagrees. The Stipulation, to which the intervenors are signatory parties, gives them the right to ensure that those terms which affect their interests are properly implemented. Paragraph 75 of the Stipulation provides that plaintiffs shall exercise reasonable efforts to ascertain whether voluntary compliance can be obtained prior to seeking judicial redress for alleged noncompliance by defendants with the terms of the Stipulation. This provision, contrary to the City's assertions, does not exclude the intervenors

from enforcing the Stipulation. Accordingly, the intervenors' claim for fees did not terminate upon filing the Stipulation with the Court.

■ Third, the City contends that it is not liable for any attorneys' fees incurred by the intervenors in defending the Stipulation on appeal. On this point, the Court agrees. The appeal was filed solely by the sectarian agencies. The Court does not believe it would be reasonable to require the City, a signatory party to the Stipulation, to be responsible for any of the fees expended in defending the Stipulation against appellate challenge by parties over whom the City had no control. Accordingly, the $28,403.75 in attorneys' fees claimed by the intervenors in connection with the appeal will be excluded from the fee award.

■ Next, the City challenges the hourly rates sought by intervenors. The intervenors have requested hourly rates which are equivalent to the actual rates billed by their counsel to paying clients during the relevant time periods. Nonetheless, the City challenges these rates as excessive. In determining the elements of reasonable attorneys' fees, courts have consistently looked to the marketplace as a guide, *Missouri v. Jenkins, supra*, 109 S.Ct. at 2470, and in determining whether the requested rates fall within the prevailing market rates, "rates charged in private representations may afford relevant comparisons." *Blum v. Stenson, supra*, 465 U.S. at 896, n. 11, 104 S.Ct. at 1547, n. 11.

The intervenors are entitled to a reasonable hourly rate calculated in accordance with the prevailing marketplace rates in the New York community for lawyers of similar experience and reputation engaged in similar litigation. The hourly rate actually charged to clients by an attorney is a strong indication of the prevailing market

---

11. The intervenors maintain that the original diary entries were not produced because these diaries contain confidential billing information regarding other clients. The intervenors claim they offered to work out an arrangement whereby the City would have been allowed access to the diaries in order to randomly check entries, but the City did not respond to this suggestion.

Affidavit of Donald J. Cohn, filed September 15, 1989 at ¶ 4. The intervenors also state that they would have produced redacted versions of the original diary entries if the City had agreed to bear the cost of this procedure. *Id.*

rate for that attorney's work, which implicitly accounts for the attorney's skill and reputation in the community. *See Laffey v. Northwest Airlines*, 746 F.2d 4, 24 (D.C. Cir.1984) (rate actually charged by a prevailing party's counsel in private practice will provide fair compensation when used in determining a fee award as long as the rate falls within the range of rates charged by other firms in the community for similar work), *cert. denied*, 472 U.S. 1021, 105 S.Ct. 3488, 87 L.Ed.2d 622 (1985); *Barcia v. Sitkin*, 683 F.Supp. 353, 357 (S.D.N.Y. 1988) (in determining reasonable hourly rate, court would look first to any existing schedule of fees charged by counsel for services performed in previous or other cases); *Berkman v. City of New York*, No. 79–1813, slip op. at 9–10 (S.D.N.Y. November 25, 1985) (annexed as Appendix 1 to the City's Memorandum of Law, filed August 11, 1989). Still, the rate an attorney charges paying clients is not necessarily the rate which should be compensated under section 1988, because the services required by nonpaying clients may well differ from those required by paying clients. *See*

*McCann v. Coughlin*, 698 F.2d 112, 130 (2d Cir.1983).

The Court concludes that the hourly rates charged by Polier, Tulin, Clark and Zalk for Tulin's time in this litigation are appropriate, as they fall well within the range of hourly rates charged by partners at major law firms in Manhattan during the relevant time periods. *See* Exhibits K, L, O, P annexed to Affidavit of Marcia Robinson Lowry, filed February 24, 1989. These rates are especially reasonable given the amount of experience lead counsel for the intervenors brought to this case.[12] The intervenors have sought to charge Cohn's time at higher rates than those charged for Tulin's, presumably based on the differences in their respective firm's actual charges, not the contributions made by each to the settlement. The Court finds that the hourly rates requested by Tulin most reasonably reflect the prevailing rate for such work in the relevant legal community. Accordingly, the Court will adjust Cohn's hourly rates to the same level as those rates requested by Tulin.[13]

12. Tulin graduated from Yale Law School in 1954, cum laude, Order of Coif, having been Comment Editor of the Yale Law Journal. He clerked for the Honorable Edward Weinfeld of the Southern District of New York in 1954 and 1955. He has been a member of the bar for 34 years, and a partner in his current firm since 1961. Among his other activities, Tulin has been involved in the legal aspects of child care for more than twenty-five years, acting as general counsel to Louise Wise Services since 1976, and has assisted in drafting certain laws regarding family law and child care in New York State. Affidavit of Stephen Wise Tulin, filed March 20, 1989 at ¶¶ 2–6. Cohn is a 1955 graduate of Yale Law School where he was an editor

of the Yale Law Journal. Upon graduation he entered private practice with the firm now known as Webster & Sheffield, and has remained with that firm to the present time, with the exception of several years spent in the United States Attorney's Office for the Southern District of New York. Webster & Sheffield has represented the Children's Aid Society and Cohn asserts that he has been involved in several child care matters during his time in private practice. Affidavit of Donald J. Cohn, filed March 20, 1989 at ¶¶ 20–21.

13. The rates charged for Tulin's time and the rates charged for Cohn's time are set forth below.

| Year | Tulin's Hourly Rate | Cohn's Hourly Rate |
|------|---------------------|--------------------|
| 1984 | 200.00 | 250.00 |
| 1985 | 225.00 | 250.00 |
| 1986 | 225.00 | 300.00 |
| 1987 | 250.00 | 300.00 |
| 1988 | 250.00 | 325.00 |
| 1989 | 250.00 | 325.00 and 350.00 |

The value of Cohn's time on the substance of this litigation, at rates adjusted to comport with those charged by Tulin, is calculated below.

The rates and amount of compensation requested by the intervenors appear in parenthesis.

| Year | Hours | Rate $ | Amount $ |
|------|-------|--------|----------|
| 1984 | 279.00 | 200.00 | 55,800.00 |
| | | (250.00) | (69,750.00) |
| 1985 | 15.25 | 225.00 | 3,431.25 |
| | | (250.00) | (3,812.50) |
| 1986 | 17.50 | 225.00 | 3,937.50 |
| | | (300.00) | (5,250.00) |

The City has also attacked as inflated the hourly rates of Tracy Miller, Seth Lahn and S.A. Lewis, three associates for Webster & Sheffield who were involved in this litigation on behalf of the intervenors. The rates charged by the intervenors for these individuals, as well as the rates charged for the time expended by other associates and paralegals for whom the intervenors seek compensation, are also the actual rates intervenors' counsel charged to paying clients.[14] These rates fall within the parameters of the hourly rates charged by similar firms in New York City for associates and the Court finds them to be reasonable. Accordingly, no adjustment will be made to these rates.

Finally, the City contends that the intervenors have not met their burden of showing that all the hours for which they seek compensation are properly documented, or that they exercised appropriate billing judgment in incurring the number of hours expended on this litigation. The Supreme Court in *Hensley* has outlined certain prerequisites for determining the amount of a reasonable fee.

The party seeking an award of fees should submit evidence supporting the hours worked and the rates claimed.

Where the documentation of hours is inadequate, the district court may reduce the award accordingly.

The district court also should exclude from this initial fee calculation hours that were not "reasonably expended." [citation omitted] Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in a private practice is ethically obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important consideration in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." [citation omitted] *Hensley v. Eckerhart, supra,* 461 U.S. at 434, 103 S.Ct. at 1939 (emphasis in original).

██ The time records submitted by the intervenors concerning work performed on the substance of this litigation support, to a large extent, the amount of their attorneys' fees request. A great majority of the en-

| Year | Hours | Rate $ | Amount $ |
|------|-------|--------|----------|
| 1987 | 21.00 | 250.00 | 5,250.00 |
| | | (300.00) | (6,300.00) |
| 1988 | 20.25 | 250.00 | 5,062.50 |
| | | (325.00) | (6,581.25) |
| 1989 | 5.75 | 250.00 | 1,437.50 |
| | (1.25) | (325.00) | (406.25) |
| | (4.50) | (350.00) | (1,575.00) |
| TOTAL: | | | 74,918.75 |
| | | | (93,675.00) |

Cohn's adjusted compensation for time spent on the fee application is as follows:

| Year | Hours | Rate $ | Amount $ |
|------|-------|--------|----------|
| 1987 | 0.50 | 250.00 | 125.00 |
| | | (300.00) | (150.00) |
| 1988 | 9.00 | 250.00 | 2,250.00 |
| | | (325.00) | (2,925.00) |
| 1989 | 28.50 | 250.00 | 7,125.00 |
| | (13.25) | (325.00) | (4,306.25) |
| | (15.25) | (350.00) | (5,337.50) |
| TOTAL: | | | 9,500.00 |
| | | | (12,718.75) |

14. The City has not challenged the hourly rates charged by the other associates, summer associates and paralegals included in the intervenors' fee request. Instead, the City maintains that none of the time these additional individuals expended is compensable.

tries are sufficiently documented and reflect reasonable expenditures of time given the issues and the circumstances surrounding negotiating and enforcing the Stipulation. The City, however, has identified a number of entries in the time records which fail adequately to describe the nature of the work performed. These entries are too vague to merit compensation. *See United States Football League v. National Football League, supra,* 704 F.Supp. at 477 (vagueness in documentation of time records will result in a 10% reduction in the fee award).

 In addition, it is apparent upon inspection of the time records that an excessive amount of time was spent by the intervenors' counsel participating in conferences with clients and co-counsel. While the Court acknowledges the logistical problems involved in serving nineteen child care agency clients, not all of the conferences between counsel should be borne as an expense by the City. Similarly, the participation of both lead counsel for the intervenors at the same time was essentially duplicative, although much of this duplication was mitigated by the division of work between counsel.[15] It is proper to reduce a fee request when a party seeks compensation for efforts which essentially duplicated another attorney's work. *New York Association for Retarded Children v. Carey, supra,* 711 F.2d at 1146. Furthermore, the intervenors initially adopted certain positions in opposition to the proposed stipulation which were later abandoned, including a challenge to this Court's authority to grant relief that would substantially alter the child care system in New York City. *See* Exhibits C, D & E, annexed to Affidavit of Marcia Robinson Lowry, filed June 8, 1989. Time spent on these issues does not merit compensation under section 1988. Accordingly, the Court believes it is appropriate to reduce the amount of the fee

request by twenty percent, from $368,-892.00 [16] to $295,113.60.

 The intervenors argue that an enhancement of the fee award by a multiplier of 1.75 is appropriate given their degree of success in opposing the initial proposed stipulation and negotiating the final Stipulation. The Supreme Court has explained that an enhancement of a fee award is proper only in certain rare and exceptional cases. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, supra,* 478 U.S. at 565, 106 S.Ct. at 3098; *Blum v. Stenson, supra,* 465 U.S. at 898–901, 104 S.Ct. at 1548–50. *See also Krieger v. Gold Bond Building Products,* 863 F.2d 1091, 1099 (2d Cir.1988). The purpose of the fee-shifting statute is not exactly to replicate a private fee arrangement, but to ensure that private parties will be able to retain counsel to further the objectives of the civil rights statutes. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, supra,* 478 U.S. at 565, 106 S.Ct. at 3098. The applicant bears the burden of overcoming the presumption that the lodestar reflects a reasonable fee award and establishing that an enhancement is appropriate. *See Soler v. G & U, Inc.,* 658 F.Supp. 1093, 1102–03 (S.D.N.Y.1987).

In the context of this case, the Court does not view an enhancement over and above the reasonable fee assessed as warranted based on the success of the intervenors. The intervenors, plaintiffs and the City all ultimately collaborated to create the Stipulation approved by the Court. The significant contributions of the intervenors to the creation of the Stipulation and the expertise and skillful advocacy added to the litigation by intervenors' counsel were important ingredients in achieving the results obtained, but are factors which have been taken into consideration in arriving at the adjusted fee award.

**15.** Tulin focused on the clinical aspects of the issues involved with the child care system and Cohn concentrated on the constitutional concerns raised by the Stipulation. *See* Affidavit of Donald J. Cohn, filed March 20, 1989 at ¶ 20.

**16.** This figure represents the amount sought for work on this litigation less the amount spent on defending the Stipulation on appeal and adjusted to reflect the Court's modification of Cohn's billing rate.

█ Intervenors' counsel have indicated to the Court that they had no retainer agreements with their clients concerning this litigation, and argue that this created a risk of loss which justifies an enhancement of the fee award. Affidavit of Stephen Wise Tulin, filed September 1, 1989, at ¶ 7. In and of itself, however, a contingency arrangement is not a sufficient basis for increasing the amount of the fee award above the lodestar. *Lewis v. Coughlin*, 801 F.2d 570, 575 (2d Cir.1986). The risk of loss does not merit an enhancement in this case, because the intervenors have not even attempted to show that without the possibility of enhancement competent counsel might have refused to represent them, thereby denying them effective access to the courts. *See Friends of the Earth v. Eastman Kodak Co.*, 834 F.2d 295, 298 (2d Cir.1987).

One additional factor to be considered in determining whether to enhance a fee award is delay in payment, because compensation received several years after services were rendered is not equivalent to the same compensation received at the time the services were performed. *Missouri v. Jenkins, supra*, 109 S.Ct. at 2469. The Court is mindful of the need to insure effective access to judicial process and the importance of not penalizing attorneys who choose to represent parties in complex and lengthy litigation which furthers the purposes of the civil rights laws. In the Court's view, however, the amount of the fee award granted intervenors provides them with full compensation.

█ Intervenors are also entitled to compensation for the attorneys fees incurred in preparing the fee application, *see New York Association for Retarded Children v. Carey, supra*, 711 F.2d at 1148, but the amount of remuneration sought for Fees for Fees in this case must be reduced.

Intervenor's seek $103,677.50 for work performed on the fee application, approximately twenty-five percent of their total requested fee award. This figure overstates the amount reasonably recoverable. The City argues that the number of individuals involved in the fee application was excessive, much of the work performed by these individuals was duplicative, some of the time attributed to the fee application against the City included time spent litigating against the sectarian agencies and plaintiffs regarding fees, and much of the time requested is inadequately documented. The Court concurs with at least some of these objections, noting, in particular, the large number of individuals involved in preparing the application, the time these individuals expended familiarizing themselves with the case, and the inadequate descriptions accompanying certain of the time entries. In addition, there were several discrepancies in the figures asserted in the fee application materials presented by the intervenors.[17] Moreover, the intervenors seek considerable reimbursement for time involved with purely administrative tasks that was billed at relatively high rates. Accordingly, the Court believes it is appropriate to reduce the amount sought in connection with the fee application by forty percent, from $100,458.751[18] to $60,275.25.

█ The intervenors seek $17,020.59 in costs. They have submitted summaries of the expenses they allegedly incurred in this case, but failed to submit detailed documentation of the reimbursement request. *See In re Agent Orange Product Liability Litigation*, 611 F.Supp. 1296, 1314 (E.D.N.Y.1985) *aff'd in part, rev'd in part*, 818 F.2d 226 (2d Cir.1987). Indeed, for certain of the expenditures, the intervenors admit that documentation is not available, and no reconstruction of these expenses has been

---

17. *Compare*, Affidavit of Stephen Wise Tulin, filed September 1, 1989 at ¶ 2(b)2, with Affidavit of Donald J. Cohn, filed March 20, 1989 at ¶¶ 27–29 and Affidavit of Joseph M. Heppt, filed September 1, 1989 at ¶ 5 (all presented slightly different summaries of the amounts sought by the intervenors). *See also*, Schedule C, annexed to Letter from Joseph M. Heppt dated November 13, 1989, filed November 27, 1989 (total value of Cohn's time was slightly miscalculated, and total value of additional time spent on fee application was tallied incorrectly); Schedule B, annexed to *id.*

18. This figure represents the amount sought for the fee application, adjusted to reflect Cohn's modified billing rate.

undertaken. The disbursements incurred by a prevailing party's counsel may be compensated when these expenditures add to the proceeding, and are not part of the attorneys' ordinary overhead. *Carrero v. New York City Housing Authority, supra,* 685 F.Supp. at 909. Due to the inadequate documentation concerning the expenses, the Court is unable to ascertain precisely how much of these costs are compensable. Accordingly, the Court will likewise reduce the amount of compensable disbursements by forty percent, from $17,020.59 to $10,212.35.

### CONCLUSION

The intervenors are prevailing parties under section 1988, entitled to an award of attorneys' fees in the amount of $355,388.85 and disbursements in the amount of $10,212.35.

Settle order on notice.