944 F.2d 1028
 60 USLW 2238
 Shirley WILDER; Thomas Edwards, and Sharon Rodwell; Barry
Parker; by his mother and next friend, Madeline Butler;
Robin Herbert, by her mother and next friend; Nancy
Herbert; Shedrick Roberts, by his mother and next friend;
Annie Robert; Christopher Torian, by his mother and next
friend; Lillian Torian, on their own behalf and on behalf
of all others similarly situated; Dr. Kenneth Clark, Rev.
Howard Moody, Dr. Richard Cloward, Mildred Davis, Plaintiffs,
v.
Blanche BERNSTEIN, individually and as Administrator of the
New York City Human Resources Administration; the City of
New York; the New York City Department of Social Services;
Barbara Blum, individually and as Commissioner of the New
York State Department of Social Services; Beverly Sanders,
individually and as Administrator of Special Services for
Children; Carol Parry; Elizabeth Beine; Linda Marino,
individually and as Director of the Office of Allocations
and Accountability of Special Services for Children; Arthur
Levitt, as comptroller of the State of New York; Harrison
J. Goldin; as Comptroller of the City of New York; Paula
Rabinow, individually and as Director of the Joint Planning
Service; Sandra Howard, individually and as Super-visor of
the Central Referral Unit; Sister Mary Francene,
individually and as Administrator of the Angel Guardian
Home; Sister Sheila, individually and as Executive
Administrator of Astor Home for Children; Fred Apers,
individually and as Executive Director of Cardinal Hayes
Home for Children; John DeMartino, individually and as
Executive Director of Cardinal McCloskey School and Home for
Children; James P. O'Neill, individually and as Executive
Director of Catholic Guardian Society; Catherine White,
individually and as Director of Catholic Guardian Society of
the Diocese of Brooklyn; Sister Una McCormack, individually
and as Executive Director of Catholic Home Bureau for
Dependent Children; Dr. Jerome Goldsmith, individually and
as Executive Director President of Jewish Board of
Guardians; Abe Lavine, individually and as Executive Vice
President of Jewish Child Care Association of NY; Jacob
Trobe; Brother Brendan Breen, individually and as
Administrator of Lincoln Hall; Brother Christopher Foley;
Ralph Chilion, individually and as Director of Little Flower
Children's Services; Sister Rosalie McNaughton,
individually and as Executive Director of McMahon Services
for Children; Sister Mary James, individually and as
Administrator of Madonna Heights School for Girls; Kenneth
A. Miller, individually and as Director of Maimonides
Residential Centers; Isaac Maizes; Sister Mary Chrysostom,
individually and as Administrator of Mercy Home for
Children; Bathsheva Mandel, individually and as Director of
Mishkon B'Nai Y'Israel; Monsignor Edmund F. Fogarty,
individually and as Executive Director of Mission of the
Immaculate Virgin; Sister Marian Cecilia Schneider,
individually and as Executive Director of the New York
Foundling Hospital; Lester Kaufman, Individually and as
Executive Director of Ohel Children's Home; Hugh Wallace,
individually and as Residence Director of Pius XII school;
Brother Robert Fontaine; Denie Barry, individually and as
Executive Director of St. Agatha Home for Children;
Rosemary A. Sheridan, individually and as Executive Director
of St. Cabrini Home Inc.; Robert J. McMahon, individually
and as Executive Director of St. Christopher's Home; Sister
Mary Patrick, individually and as Executive Director of St.
Dominic's Home; Sister Mary Sheila, individually and as
Director of St. Germaine's Home; Brother Thomas Trager,
individually and as Executive Director of St. John's
Residence and School for Boys; Sister Rita Meaney,
individually and as Administrator of St. Joseph's Children
Services; Sister Marita Paul, individually and as Executive
Director of St. Joseph's Home of Peekskill; Sister Mary
Oliva, individually and as Administrator of St. Mary's of
the Angels Home; Emanuel J. Starace, individually and as
Executive Director of St. Michael's Home; Sister Della Mae
Quinn, R.S.M.; Rev. Robert M. Harris, individually and as
Administrator of St. Vincent's Hall; Joseph Altheimer,
individually and as Administrator of Sister of the Good
Shepherd Residences, Defendants-Appellants,
Abbott House, Berkshire Farm Center & Services for Children,
Brooklyn Home for Children, Brookwood Child Care, Episcopal
Mission Society, Green Chimneys Children's Service,
Heartsease Home, Inc., Inwood House, Lakeside School, Louise
Wise Services, Lutheran Community Services, Puerto Rican
Family Association, St. Christopher-Jennie Clarkson Child
Care Services, Sheltering Arms Childrens Service, Society
for Seamen's Children, Spence-Chapin Services to Children,
Talbot Perkins Children's Services, the Children's Aid
Society, and the Children's Village, Intervenors-Appellees.
 No. 896, Docket 90-7698.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 17, 1991.
Decided Sept. 24, 1991.
 
 Oakes, Chief Judge, filed dissenting opinion.
 Elizabeth Dvorkin, New York City (Victor A. Kovner, Corp. Counsel of the City of New York, Stephen J. McGrath, Francis F. Caputo, of counsel), for defendants-appellants.
 Donald J. Cohn, New York City (Bruce Topman, Webster & Sheffield, Stephen Wise Tulin, Polier, Tulin, Clark & Zalk, of counsel), for intervenors-appellees.
 Before OAKES, Chief Judge, and CARDAMONE and WALKER, Circuit Judges.
 CARDAMONE, Circuit Judge:
 We again visit the controversy regarding New York City's scheme for providing child care services to foster children who require placement in institutions and foster homes. Before us is an appeal by the City of New York (City or appellant) from a June 29, 1990 order of the United States District Court for the Southern District of New York (Ward, J.) awarding $355,388.85 in attorney's fees to appellees-intervenors, a group of 19 private child care agencies.[1]
 
 
 1
 We are asked to determine whether an intervenor group, which contributed importantly to the formation of the settlement we approved in Wilder v. Bernstein, 848 F.2d 1338 (2d Cir.1988), is entitled to an award of attorney's fees under 42 U.S.C. § 1988 (1988). In making that determination we can see Congress planned that individuals asserting their civil rights should be able to recover what it cost them to vindicate these rights, and that awarding attorney's fees to such individuals implemented this design. Where Congress looks to one thing as a solution to a problem, courts should not look to another thing, and thereby alter Congress' plan by broadening the definition of those entitled to such fees. Because we think that is what the district court did in this case, we reverse.
 
 BACKGROUND
 
 2
 The facts are set forth in Judge Ward's thorough opinion reported at 725 F.Supp. 1324 (S.D.N.Y.1989), with which we assume the reader's familiarity, as well as in his opinion approving the settlement of the underlying lawsuit, reported at 645 F.Supp. 1292 (S.D.N.Y.1986). We recount only those facts relevant to this appeal.
 
 
 3
 The underlying litigation commenced in 1973 when New York City's child care placement system was challenged by a group of plaintiffs representing a class of Protestant Black children. Plaintiffs ultimately asserted in their complaint four grounds on which they attacked the City's foster care system: (1) the child care system operated to discriminate against children based on race, (2) it discriminated on the basis of religion, (3) it amounted to an establishment of religion, and (4) it unduly burdened the free exercise rights of Protestant children, who were not Catholic or Jewish. The complaint sought declaratory and injunctive relief under 42 U.S.C. §§ 1983, 1985, and 1986, and 28 U.S.C. §§ 2201 and 2202. The matters alleged in the complaint were claimed to violate the First and Fourteenth Amendments, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (1982), and New York anti-discrimination regulations, 18 N.Y.C.R.R. §§ 303.1, 303.2 (1978).
 
 
 4
 In this complex litigation many groups became involved to varying degrees and for varying reasons. The main participants were (1) plaintiffs, a group of Protestant Black children, who were neither Catholic nor Jewish, in need of care outside their homes; (2) defendants New York City and municipal officials responsible for the City's child care system; (3) defendants administrators of private, religiously affiliated, either Jewish or Catholic, child care agencies (defendant agencies); and (4) intervenors.
 
 
 5
 In the summer of 1983, shortly before trial was scheduled to begin, plaintiffs and the City began negotiations in an attempt to reach a settlement. At that time intervenors had in their care 4,600 children constituting 25 percent of the 17,000 children then in the City's foster care system. Most of those in intervenors' care were Black Protestant children and belonged therefore to the plaintiff class. In January 1984 some of the eventual intervenors wrote to the Corporation Counsel of New York City expressing strong objections to drafts of the settlement negotiated by it and plaintiffs. In April of that year plaintiffs and the City presented a proposed stipulation of settlement to the district court. The settlement ignored comments and suggestions made by the intervenor agencies, and was objected to by the defendant agencies and by intervenors. Intervenors continued to press their objections and, on June 15, 1984, were granted leave to intervene "for the limited purpose of opposing the proposed settlement."
 
 
 6
 Appellees presented comprehensive criticisms of the proposed settlement supported by affidavits from child care professionals. The objections were addressed to the administrative unworkability of the settlement, its failure to consider adequately the needs of the children served, and its discrimination on religious grounds. Negotiations, in which intervenors then participated, continued through the summer. In August basic agreement on general topics was reached. The parties continued to negotiate, this time in open court, and in January 1985 a stipulation of settlement was submitted. On October 8, 1986, over the objections of the defendant agencies, the district court approved the stipulation of settlement. On appeal, we affirmed the settlement. 848 F.2d 1338.
 
 
 7
 On March 17, 1989 intervenors moved for attorney's fees under § 1988. Specifically, they sought from the City fees of $416,052.50, enhanced by a factor of 1.75 for a total of $775,303.50, disbursements of $17,020.59, and continuing City liability for fees related to enforcement of the decree. The City opposed the application, asserting that intervenors were not a prevailing party because they had no federal constitutional or statutory rights within the meaning of 42 U.S.C. § 1988 (1988) at stake in the litigation. The City had already paid plaintiffs $1,775,000 in attorney's fees and costs pursuant to an offer of judgment submitted by the City in late June 1989, which was accepted by plaintiffs shortly thereafter.
 
 
 8
 In its opinion approving the stipulation of settlement and in its opinion awarding attorney's fees to intervenors, the district court detailed intervenors' extensive contributions in reaching the settlement finally accepted by all participants, except the defendant agencies. Because they had "no axes to grind," the district court stated, intervenors were able to measure the proposals according to the best interests of the children and provide it with valuable insights into the clinical and administrative realities of child care. The stipulation of settlement finally adopted, while adhering to the general outline of the original stipulation, was influenced by the concerns aired by intervenors.
 
 
 9
 The court found intervenors' efforts were essential to the creation of a workable remedy that vindicated the civil rights of the children and their families in the foster care system, and held that the intervenors were therefore prevailing parties entitled to an award of attorney's fees and costs. It did not accept appellees' computation of fees, denied their request for an enhancement factor, and awarded fees in the amount of $355,388.85 and disbursements of $10,212.35. The City of New York has appealed.
 
 DISCUSSION
 
 10
 The City challenges the district court's conclusion that intervenors were a prevailing party and thus eligible for attorney's fees under 42 U.S.C. § 1988 (1988). We begin with the American Rule that declares no attorney's fees are recoverable absent express statutory authority for an award. See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 561-62, 106 S.Ct. 3088, 3096-97, 92 L.Ed.2d 439 (1986). Unless Congress empowers it, a federal court has no authority to award attorney's fees to prevailing parties. See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 269, 95 S.Ct. 1612, 1627, 44 L.Ed.2d 141 (1975). Hence, our task is to determine whether Congress in enacting § 1988 contemplated an award of attorney's fees in the present circumstances.
 
 
 11
 We turn to that statute, which states in pertinent part:
 
 
 12
 In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92-318, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.
 
 
 13
 42 U.S.C. § 1988 (1988). Section 1988 is analyzed in the same manner as other similarly worded fee-shifting statutes. See Indep. Fed'n of Flight Attendants v. Zipes, 491 U.S. 754, 758 n. 2, 109 S.Ct. 2732, 2735 n. 2, 105 L.Ed.2d 639 (1989). "The touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." Texas State Teachers Ass'n v. Garland Indep. School Dist., 489 U.S. 782, 792-93, 109 S.Ct. 1486, 1493-94, 103 L.Ed.2d 866 (1989).
 
 
 14
 There is no question that the legislative history of § 1988 contemplates that an intervenor may be a prevailing party. S.Rep. No. 1011, 94th Cong., 2d Sess. 4 n. 4, reprinted in 1976 U.S.Code Cong. & Admin.News 5908, 5912 n. 4 (Senate Report) ("In the large majority of cases the party or parties seeking to enforce such rights will be the plaintiffs and/or plaintiff-intervenors."). Nor does the fact that a claim has been resolved by settlement, as in this case, preclude an award of attorney's fees to the prevailing party; it is plain that a party may prevail when it vindicates rights--regardless of whether there is a formal judgment--through a settlement or consent judgment. See Hewitt v. Helms, 482 U.S. 755, 760-61, 107 S.Ct. 2672, 2675-76, 96 L.Ed.2d 654 (1987); Maher v. Gagne, 448 U.S. 122, 129, 100 S.Ct. 2570, 2574-75, 65 L.Ed.2d 653 (1980); Koster v. Perales, 903 F.2d 131, 134 (2d Cir.1990); Senate Report at 5, reprinted in 1976 U.S.Code Cong. & Admin.News at 5912. In awarding attorney's fees in the instant case, the district court found that as a result of intervenors' efforts the settlement was modified in ways that directly benefited the children in the child care system, and it concluded that a material alteration of the legal relationship of the parties in a manner that Congress sought to promote in § 1988 had therefore been effected. 725 F.Supp. at 1332.
 
 
 15
 Appellant City does not dispute the fact that appellees' input was helpful to children in the child care system, but it contends that contributions to a settlement, no matter how important or helpful, do not entitle these intervenors to attorney's fees. Something more is needed before a court may make an award under § 1988, that is, the party seeking an award must assert a violation of its own rights under the applicable civil rights statutes. The City insists intervenors have asserted no such right and therefore may not be considered prevailing parties. We agree.
 
 
 16
 In United States v. Bd. of Educ. of Waterbury, 605 F.2d 573 (2d Cir.1979), we held intervenors may be awarded attorney's fees if they "contributed importantly to the creation of remedies." Id. at 576; see also Grove v. Mead School Dist. No. 354, 753 F.2d 1528, 1535 (9th Cir.1985) ("[a]wards to intervenors should not be granted unless the intervenor plays a significant role in the litigation"); cf. Donnell v. United States, 682 F.2d 240, 247 (D.C.Cir.1982) (fees should not be awarded to intervenors in a successful suit if they played an insignificant role in producing the outcome).
 
 
 17
 Yet, in Waterbury, we did not specifically address the question of whether an intervenor, in order to be entitled to attorney's fees as a prevailing party, must also assert an interest protected by the civil rights statutes. An examination of the factual background in Waterbury reveals that many members of the intervenor group's constituency in that case asserted such a civil rights interest. See 605 F.2d at 574 (an organization consisting of Puerto Rican parents, community leaders, and individuals, was permitted to intervene in an action seeking to desegregate schools in order to protect the right of Waterbury's Hispanic students to attend integrated schools and to be free from disproportionately bearing the burden of the desegregation); see also Donnell, 682 F.2d at 244 (seven black voters intervening on the side of the United States in an action brought by the Board of Supervisors of Warren County, Mississippi, seeking a declaratory judgment that a plan to establish voting districts did not have a racially discriminatory purpose or effect were found to be prevailing parties). Thus, Waterbury does not bear the weight placed on it by the district court because the intervenors there were seeking to vindicate their own civil rights, not the rights of others.
 
 
 18
 Legislative history supports the view that though intervenors may be prevailing parties, it is only when they assert their own civil rights that they are so considered. Congress planned on having § 1988 serve as a mechanism for vindicating the rights of those whose civil rights had been violated, not for forwarding civil rights in general. For example, the House Report states:
 
 
 19
 Because a vast majority of the victims of civil rights violations cannot afford legal counsel, they are unable to present their cases to the courts. In authorizing an award of reasonable attorney's fees, [§ 1988] is designed to give such persons effective access to the judicial process where their grievances can be resolved according to law.
 
 
 20
 H.R.Rep. No. 1588, 94th Cong., 2d Sess. 1 (1976). The Senate Report contains language that even more strongly suggests that attorney's fees were to be those paid to the victims of constitutional injury, not simply a party that aids in upholding the rights of those victims. Senate Report at 2, reprinted in 1976 U.S.Code Cong. & Admin.News at 5910 ("If private citizens are to be able to assert their civil rights ... then citizens must have the opportunity to recover what it costs them to vindicate these rights in court") (emphasis added).
 
 
 21
 Because § 1988 is an exception carved out of the American Rule by Congress, we must take care not to award attorney's fees that the legislative branch has not authorized. The choice as to whether fees are available and under what circumstances is a function that Congress has reserved to itself. Russo v. New York, 672 F.2d 1014, 1023 (2d Cir.1982), modified on other grounds, 721 F.2d 410. Before awarding fees it is necessary for a court to find therefore some specific congressional plan that provides that an intervenor, not asserting its own civil rights, was an intended beneficiary of § 1988. Neither the House nor the Senate Reports just cited contain any notion that Congress anticipated that such parties would be the beneficiaries of this legislation. Thus, it seems inescapable that Congress did not contemplate awards of attorney's fees under § 1988 to persons other than to those whose civil rights have been violated.
 
 
 22
 Here no member of the intervenor group has asserted any civil rights interests of its own. Instead, intervenors became involved initially in the instant litigation because of their fear both that administrative burdens imposed by the original proposed settlement would make the foster care system even more unworkable than the record shows it presently is, and also give rise to those clinical concerns that the list of intervenors' objections in the trial court reveals, see 645 F.Supp. at 1346-47. On that score alone intervenors would doubtless have entered the settlement negotiations regardless of whether attorney's fees were available. Further, intervenors cannot be said to be the legal custodians or guardians of the children in their care. That responsibility belongs to the appropriate City agency. See N.Y.Soc.Serv.Law § 383(2) (McKinney 1983 & Supp.1991). Thus, it does not appear that intervenors are possessed of any interest that permits them to assert the civil rights of the foster children in their care and to be considered a prevailing party under § 1988.
 
 
 23
 Finally, we agree with the district court that appellees' efforts were beneficial to the children whose rights were at stake, but the City's earlier nearly two million dollar payment for plaintiffs' attorney's fees was for services that also vindicated the constitutional rights of Protestant Black children, the same constituency intervenors seek to be rewarded for representing. Congress and not the courts determines whether a party may be awarded attorney's fees. See Alyeska Pipeline Serv. Co., 421 U.S. at 269, 95 S.Ct. at 1627. And, since the intervenors before us are not one of those parties, the district court's award of attorney's fees to them must be reversed.
 
 CONCLUSION
 
 24
 The judgment of the district court is reversed. Intervenors' request for attorney's fees on appeal is denied. Each party shall bear its own costs.
 
 OAKES, Chief Judge, dissenting:
 
 25
 I dissent essentially for the reasons stated by Judge Ward, Wilder v. Bernstein, 725 F.Supp. 1324 (S.D.N.Y.1989), and because I think that the distinction drawn by the panel majority between this case and United States v. Board of Education of Waterbury, 605 F.2d 573 (2d Cir.1979), where we awarded intervenors their attorneys' fees, is a distinction without a difference. The panel majority's narrow and formalistic reading of the term "prevailing party" takes us down the same road as Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612 (1975)--a road rejected by Congress' enactment of the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988 (1988).
 
 
 26
 In contrast to the panel majority, I find no basis for the argument that Congress intended to limit attorney's fees to those intervenors who sought to vindicate their "own" civil rights claims. And even if the legislative history were to reveal reeds from which a court might weave such an interpretation, the final product would run contrary to the underlying purpose of section 1988. Complex litigation, such as the case at hand, requires that the allocation of attorneys' fees be approached with flexibility, if we are to adhere to Congress' goal of providing incentives to those who act as private attorneys general to aid in the eradication of civil rights violations. See S.Rep. No. 1011, 94th Cong., 2d Sess. 2-3, reprinted in 1976 U.S.Code Cong. & Admin.News 5908, 5909-5911; Waterbury, 605 F.2d at 576. To shift the focus of section 1988, as the panel majority does, from crafting an equitable remedy to the delineation of which rights belong to whom, distracts us from the goal Congress has set before us. As we said in Waterbury, "The precise remedy does not follow logically from the determination of liability, but rather reflects a careful reconciliation of the interests of the many affected members of the community and a choice among a wide range of possibilities." 605 F.2d at 576. Thus, unlike the panel majority, I cannot simply allude to Judge Ward's opinion and assume familiarity with it because doing so tends to underemphasize the essential findings in the case. Rather, I think it important to state precisely who the intervenors are, what they did, and why Judge Ward concluded that he was bound to award them attorneys' fees by our Waterbury decision.
 
 
 27
 This complaint challenged the entire city's child care system on the basis that it: (1) operated to discriminate against children based on race and religion; (2) amounted to the establishment of religion; and, (3) unduly burdened the free exercise rights of Protestant children, as well as (4) denied black Protestant children equal access to child care services. Wilder, 725 F.Supp. at 1327. The intervenors are a group of nineteen private child care agencies which were properly permitted to intervene in this action; they represent a broad spectrum of foster care clinicians and administrators who together care for approximately 4600 children. Id. at 1327 & n. 3. In the sixteen years of litigation involved in this case up to Judge Ward's decision in the district court, the intervenors did the following:
 
 
 28
 1. They strongly objected to the draft Stipulation of Settlement on the part of the plaintiff class and the city defendants on the basis not just that the proposed settlement was administratively unworkable but that it failed to protect the best interests of the children and unconstitutionally discriminated against children whose parents exercised a religious preference in child care. Id. at 1328.
 
 
 29
 2. The objections the intervenors presented were "comprehensive" and supported by detailed affidavits providing "important background and insight." Id.
 
 
 30
 3. The intervenors "played an integral role" concerning the content of the proposed Stipulation, and "sparked primarily" by their criticisms and suggestions, the parties resolved the numerous legal and child care issues involved. Id.
 
 
 31
 4. The final version of the Stipulation of Settlement, as supported by the intervenors, was ultimately approved by the court in Wilder v. Bernstein, 645 F.Supp. 1292 (S.D.N.Y.1986), aff'd, 848 F.2d 1338 (2d Cir.1988). In the district court's decision approving the settlement, the court noted that the intervenors' "direct participation in the New York City foster care system, and their ongoing contact with the children in care, give them the ability and incentive to comment authoritatively on the likely impact of the settlement on agency administrators and clinicians and on the children they serve." Wilder, 645 F.Supp. at 1350. In Judge Ward's later decision awarding the intervenors' attorneys' fees, presently on appeal, he said that "[t]he intervenors worked to promote a more viable solution to the problems presented by the foster care system in New York, while at the same time assuring that the best interests of all children in the system were taken into account.... they played an essential role in forging the final version of the Stipulation which was acceptable to all the parties except the sectarian agencies...." Wilder, 725 F.Supp. at 1329.
 
 
 32
 The above being true, it seems to me that this case fits squarely within our Waterbury case where we said that "[a]n intervenor is certainly a party," 605 F.2d at 576,[1] and that even though a consent decree was involved the intervenors could be considered a prevailing party because they succeeded in opposing a plan "which unfairly burdened their constituency." Id. at 577.[2] As the remedy ultimately adopted in Waterbury, a school desegregation case, "bore a substantial resemblance to the plan intervenors supported (indeed, it took the same general approach)," the court concluded that the intervenors "c[a]me within the meaning of the term 'prevailing party.' " Id. The Waterbury court, per Judge Mansfield, refused to interpret the term "prevailing party" in a fashion that would "severely limit the availability of attorneys' fees to parties whose participation contributed importantly to the creation of remedies in these cases." Id. at 576. This is exactly what the intervenors in this case did; in contributing importantly to the creation of the remedies approved by the district court and upheld in our court, they came within the meaning of the term "prevailing party."
 
 
 33
 The panel majority seeks to distinguish Waterbury by saying that there "many members of the intervenor group's constituency in that case asserted ... a civil rights interest" and that "the intervenors there were seeking to vindicate their own civil rights, not the rights of others." Majority Opinion, supra, p. 1033. So too, however, in this case the intervenor group's constituency included the plaintiff class of children asserting a civil rights interest. The intervenors in Waterbury were not themselves school children, though some of them were Hispanic. Here, too, in the foster care context, the intervenors were not children but were agencies--clinicians and administrators who care for thousands of children. As such, the intervenors had duties running to the children that made them stand in loco parentis, duties that would be implied by law if they were not already set forth in the New York Statutes. N.Y.Soc.Serv.Law §§ 383-384 (McKinney 1983 & Supp.1991). This case cannot be distinguished from Waterbury.
 
 
 34
 Furthermore, Waterbury cannot be overruled sub silentio by a panel majority. Nor should it be overruled.[3] The quotations from the House and Senate Reports used to bolster the position that intervenors who do not assert their own civil rights are not entitled to attorneys' fees seem to me, with all due respect, to have no bearing whatsoever on the question at hand. These statements were not offered in the context of whether intervenors must be asserting their own civil rights but were stated in the much more general context of whether fees should be awarded to prevailing parties generally.
 
 
 35
 I agree, in short, with the commentator who said,
 
 
 36
 It may be argued that th[e] requirement that parties must raise a civil rights claim to recover attorneys' fees should further be limited to situations where a party claims its own legal rights are violated, or will be violated by the defendant's acts or the plaintiff's proposed remedy. This limitation, however, seems unnecessary and even counter-productive. First, it has been argued here that certain intervenors should be encouraged to join civil rights actions. Second, the concerns that this limitation evince are already protected by the rules which allow intervenors to join cases. If the suggested limitation were imposed, it would exclude some desirable parties and would duplicate in effect, the rules limiting intervention. Not allowing fees to such parties would operate only against those financially unable to join a suit while the limits on intervention would operate equally on all parties.
 
 
 37
 Tamanaha, The Cost of Preserving Rights: Attorneys' Fee Awards and Intervenors in Civil Rights Litigation, 19 Harv.C.R.-C.L. L.Rev. 109, 143 n. 130 (1984) (emphasis added). But reading such a limitation into section 1988, as the majority panel does, has implications that go beyond inefficiency and inequity. By threatening to remove suits involving jus tertii, associational standing, and overbreadth from the purview of section 1988, this reading displays an insensitivity to the economic incentives Congress wished to foster and weakens the tools available to those who seek to eradicate civil rights violations. In addition, a narrow interpretation of section 1988 may have a ripple effect, weakening the more than 100 other fee-shifting statutes in the United States Code, which courts interpret by drawing upon the principles and case law of section 1988. See, e.g., Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 559-60, 106 S.Ct. 3088, 3095-96, 92 L.Ed.2d 439 (1986); Brand, The Second Front in the Fight for Civil Rights: The Supreme Court, Congress, and Statutory Fees, 69 Tex.L.Rev. 291, 306 (1990).
 
 
 38
 There is no question that, by its terms, section 1988 only authorizes fee-shifting for those parties seeking to enforce civil rights. Indeed, the court below recognized this principle. See Wilder, 725 F.Supp. at 1331 ("It is clear that the purpose of the fee-shifting statute is to encourage the vindication of civil rights, and parties who are not involved in furthering such purposes should not be entitled to benefit from the statute."). The only proper question, then, is whether intervenors sought to enforce civil rights. The district court found that they did:
 
 
 39
 The intervenors did more than just advance their own self-interests. Their participation furthered the purposes of the civil rights statutes by facilitating the formation of a settlement which would safeguard the constitutional rights of the children in the City's care, while assuring that the child care system itself would remain focused on the overall best interests of the children entitled to the protection of the civil rights laws.
 
 
 40
 Furthermore, the intervenors consistently and forcefully articulated objections addressed to the constitutional and civil rights issues in this litigation. Their efforts helped to vindicate the civil rights of the children and families in the foster care system which they served, not just their own self interests.
 
 
 41
 Id. at 1331-32. See also Wilder, 645 F.Supp. 1292, 1303-04, 1350 (S.D.N.Y.1986), aff'd, 848 F.2d 1338 (2d Cir.1988). There is ample support for this finding in the record; therefore, we should affirm the district court decision.
 
 
 42
 I eschew the narrow construction of the term "prevailing party" the majority gives the congressional statute which, after all, in the words of the Senate Report, was "an appropriate response" to Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), S.Rep. No. 1011, 94th Cong., 2d Sess. 4, reprinted in 1976 U.S.Code Cong. & Admin.News 5908, 5912. Congress sought to return to the teaching of Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968), that a party who enforced a civil rights statute "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." Id. at 402, 88 S.Ct. at 966; see also Note, Promoting the Vindication of Civil Rights through the Attorney's Fees Awards Act, 80 Colum.L.Rev. 346, 353 (1980). The intervenors here were such a party. There is no way in which it can be suggested that to grant them attorneys' fees would be "unjust." There is every reason to follow our precedent--the Waterbury case.
 
 
 
 [1]
 The intervenors group consists of the following agencies: Abbott House, Berkshire Farm Center & Services for Children, Brooklyn Home for Children, Brookwood Child Care, The Children's Aid Society, The Children's Village, Episcopal Mission Society, Green Chimneys Children's Service, Heartsease Home, Inc., Inwood House, Lakeside School, Louise Wise Services, Lutheran Community Services, Puerto Rican Family Association, St. Christopher-Jennie Clarkson Child Care Services, Sheltering Arms Children's Service, Society for Seamen's Children, Spence-Chapin Service to Children, and Talbot Perkins Children's Services
 
 
 [1]
 This point has been referred to favorably by other courts. E.g., Seattle School Dist. No. 1 v. State of Washington, 633 F.2d 1338, 1349-50 (9th Cir.1980)
 
 
 [2]
 Although the fee-shifting statute in Waterbury was not 42 U.S.C. § 1988 but, rather, section 718 of the Emergency School Aid Act of 1972, 20 U.S.C. § 1617 (repealed 1979), the pertinent language in the two statutes is "virtually identical." Waterbury, 605 F.2d at 576. There is therefore no reason not to apply the Waterbury court's analysis to a situation arising under section 1988
 
 
 [3]
 Waterbury has been favorably treated in a number of other decisions and criticized in none. E.g., Frazier v. Merit Systems Protection Bd., 672 F.2d 150, 168 (D.C.Cir.1982); Seattle School Dist. No. 1 v. State of Washington, 633 F.2d 1338, 1349-50 (9th Cir.1980). Commentators, as well, have noted the significance of Waterbury. See Rhode, Class Conflicts in Class Actions, 34 Stan.L.Rev. 1183, 1229 (1982)