965 F.2d 1196
 60 USLW 2782
 Shirley WILDER; Thomas Edwards, and Sharon Rodwell; Barry
Parker, by his mother and next friend, Madeline Butler;
Robin Herbert, by her mother and next friend, Nancy Herbert;
Shedrick Roberts, by his mother and next friend, Annie
Roberts; Christopher Torian, by his mother and next friend,
Lillian Torian, on their own behalf and on behalf of all
others similarly situated; Dr. Kenneth Clark, Rev. Howard
Moody, Dr. Richard Cloward, Mildred Davis, Plaintiffs,
v.
Blanche BERNSTEIN, individually and as Administrator of the
New York City Human Resources Administration; the City of
New York; the New York City Department of Social Services;
Barbara Blum, individually and as Commissioner of the New
York State Department of Social Services; Beverly Sanders,
individually and as Administrator of Special Services for
Children; Carol Parry; Elizabeth Beine; Linda Marino,
individually and as Director of the Office of Allocations
and Accountability of Special Services for Children; Arthur
Levitt, as Comptroller of the State of New York; Harrison
J. Goldin, as Comptroller of the City of New York; Paula
Rabinow, individually and as Director of the Joint Planning
Service; Sandra Howard, individually and as Supervisor of
the Central Referral Unit; Sister Mary Francene,
individually and as Administrator of the Angel Guardian
Home; Sister Sheila, individually and as Executive
Administrator of Astor Home for Children; Fred Apers,
individually and as Executive Director of Cardinal Hayes
Home for Children; John DeMartino, individually and as
Executive Director of Cardinal McCloskey School and Home for
Children; James P. O'Neill, individually and as Executive
Director of Catholic Guardian Society; Catherine White,
individually and as Director of Catholic Guardian Society of
the Diocese of Brooklyn; Sister Una McCormack, individually
and as Executive Director of Catholic Home Bureau for
Dependent Children; Dr. Jerome Goldsmith, individually and
as Executive Director President of Jewish Board of
Guardians; Abe Lavine, individually and as Executive Vice
President of Jewish Child Care Association of NY; Jacob
Trobe; Brother Brendan Breen, individually and as
Administrator of Lincoln Hall; Brother Christopher Foley;
Ralph Chillion, individually and as Director of Little
Flower Children's Services; Sister Rosalie McNaughton,
individually and as Executive Director of McMahon Services
for Children; Sister Mary James, individually and as
Administrator of Madonna Heights School for Girls; Kenneth
A. Miller, individually and as Director of Maimonides
Residential Centers; Isaac Maizes; Sister Mary Chrysostom,
individually and as Administrator of Mercy Home for
Children; Bathsheva Mandel, individually and as Director of
Mishkon B'Nai Y'Israel; Monsignor Edmund F. Fogarty,
individually and as Executive Director of Mission of the
Immaculate Virgin; Sister Marian Cecilia Schneider,
individually and as Executive Director of the New York
Foundling Hospital; Lester Kaufman, individually and as
Executive Director of Ohel Children's Home; Hugh Wallace,
individually and as Residence Director of Pius XII School;
Brother Robert Fontaine; Denie Barry, individually and as
Executive Director of St. Agatha Home for Children;
Rosemary A. Sheridan, individually and as Executive Director
of St. Cabrini Home Inc.; Robert J. McMahon, individually
and as Executive Director of St. Christopher's Home; Sister
Mary Patrick, individually and as Executive Director of St.
Dominic's Home; Sister Mary Sheila, individually and as
Director of St. Germaine's Home; Brother Thomas Trager,
individually and as Executive Director of St. John's
Residence and School for Boys; Sister Rita Meaney,
individually and as Administrator of St. Joseph's Children's
Services; Sister Marita Paul, individually and as Executive
Director of St. Joseph's Home of Peekskill; Sister Mary
Oliva, individually and as Administrator of St. Mary's of
the Angels Home; Emanuel J. Starace, individually and as
Executive Director of St. Michael's Home; Sister Della Mae
Quinn, R.S.M.; Rev. Robert M. Harris, individually and as
Administrator of St. Vincent's Hall; Joseph Altheimer,
individually and as Administrator of Sister of the Good
Shepherd Residences, Defendants-Appellants.
Abbott House, Berkshire Farm Center & Services for Children,
Brooklyn Home for Children, Brookwood Child Care, Episcopal
Mission Society, Green Chimneys Children's Service,
Heartsease Home, Inc., Inwood House, Lakeside School, Louise
Wise Services, Lutheran Community Services, Puerto Rican
Family Association, St. Christopher-Jennie Clarkson Child
Care Services, Sheltering Arms Children's Service, Society
for Seamen's Children, Spence-Chapin Services to Children,
Talbot Perkins Children's Services, the Children's Aid
Society, and the Children's Village, Intervenors-Appellees.
 No. 896, Docket 90-7698.
 United States Court of Appeals,
Second Circuit.
 Petition for Rehearing Filed Oct. 8, 1991.
Rehearing Granted June 3, 1992.
 
 Elizabeth Dvorkin, New York City (Victor A. Kovner, Corp. Counsel of the City of New York, Stephen J. McGrath, and Francis F. Caputo, of counsel), for defendants-appellants.
 Donald J. Cohn, New York City (Bruce Topman, Webster & Sheffield; and Stephen Wise Tulin, Polier, Tulin, Clark & Zalk, of counsel), for intervenors-appellees.
 Before: OAKES, Chief Judge, CARDAMONE and WALKER, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 This panel had before it last year an appeal by the City of New York (City or appellant) from a June 29, 1990 order of the United States District Court for the Southern District of New York (Ward, J.) awarding $355,388.85 in attorneys' fees to appellees-intervenors, a group of 19 private child care agencies.[1] We were asked on that appeal to determine whether the intervenor group, which contributed importantly to the formation of the settlement we had previously approved in Wilder v. Bernstein, 848 F.2d 1338 (2d Cir.1988), was entitled to such an award under 42 U.S.C. § 1988 (1988). In a decision by a divided panel (Oakes, C.J., dissenting), we reversed the intervenors' award. See Wilder v. Bernstein, 944 F.2d 1028 (2d Cir.1991).
 
 
 2
 Subsequently, a petition for a rehearing with a suggestion for rehearing en banc was filed by intervenors. Upon further reflection we are all now convinced, primarily by the views expressed by the Chief Judge in his dissenting opinion, that the intervenors are entitled to an award of attorneys' fees. The petition for rehearing is therefore granted. Our prior opinion reported at 944 F.2d 1028 reversing the district court order of June 29, 1990 is vacated and replaced with the following opinion, which prior to its filing has been circulated to all the active and senior judges of this Court. The case must nonetheless be remanded to the district court for it to sort out what should be the amount of those fees. We set forth guides for that purpose later in this opinion to inform the district court in the exercise of its discretion.
 
 BACKGROUND
 
 3
 The facts are set forth in Judge Ward's thorough opinion reported at 725 F.Supp. 1324 (S.D.N.Y.1989), with which we assume the reader's familiarity, as well as in his opinion approving the settlement of the underlying lawsuit, reported at 645 F.Supp. 1292 (S.D.N.Y.1986). We recount only those facts relevant to this appeal.
 
 
 4
 The underlying litigation commenced in 1973 when New York City's child care placement system was challenged by a group of plaintiffs representing a class of Protestant Black children. Plaintiffs ultimately asserted in their complaint four grounds on which they attacked the City's foster care system: (1) the child care system operated to discriminate against children based on race, (2) it discriminated on the basis of religion, (3) it amounted to an establishment of religion, and (4) it unduly burdened the free exercise rights of Protestant children. The complaint sought declaratory and injunctive relief under 42 U.S.C. §§ 1983, 1985, and 1986, and 28 U.S.C. §§ 2201 and 2202. The matters alleged in the complaint were claimed to violate the First and Fourteenth Amendments of the United States Constitution, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (1982), and New York anti-discrimination regulations, 18 N.Y.C.R.R. §§ 303.1, 303.2 (1978).
 
 
 5
 In this complex litigation many groups became involved to varying degrees and for varying reasons. The main participants were (1) plaintiffs, a group of Protestant Black children in need of care outside their homes; (2) defendants New York City and municipal officials responsible for the City's child care system; (3) defendants administrators of private, religiously affiliated, either Jewish or Catholic, child care agencies (defendant agencies); and (4) intervenors administrators of 19 private child care agencies. Among the intervenors were former defendant agencies who had been previously dismissed from the action with prejudice, some who had been dismissed without prejudice, and others who had never before been involved in the action.
 
 
 6
 In the summer of 1983, shortly before trial was scheduled to begin, plaintiffs and the City began negotiations in an attempt to reach a settlement. At that time intervenors had in their care 4,600 children constituting 25 percent of the 17,000 children then in the City's foster care system. Most of those in intervenors' care were Black Protestant children and belonged therefore to the plaintiff class. In January 1984 some of the eventual intervenors wrote to the Corporation Counsel of New York City expressing strong objections to drafts of the settlement negotiated by it and plaintiffs. In April of that year plaintiffs and the City presented a proposed stipulation of settlement to the district court. The settlement ignored comments and suggestions made by the intervenor agencies, and was objected to by the defendant agencies and by intervenors. Intervenors continued to press their objections and, on June 15, 1984, were granted leave to intervene "for the limited purpose of opposing the proposed settlement."
 
 
 7
 We digress for a moment to discuss how leave to intervene came about. Although no petition for intervention was filed, letters, memoranda and affidavits objecting to the stipulation were submitted prior to the date intervention was ordered. The customary terms of either "plaintiff-intervenor" or "defendant-intervenor" were not used to refer to the intervenors. Nor does the district court's order set forth on what grounds and under which section of Fed.R.Civ.P. Rule 24 they were permitted entry into the action. In the case of at least some of the former defendant intervening agencies, the original parties had agreed in the decree permitting their dismissal that the dismissed agencies would receive reasonable notice of any proposed settlement and would be permitted, as of right, to appear and participate in any settlement proceeding. The district court considered the intervenors "nonparties vis-a-vis the underlying constitutional claims in the lawsuit" and, despite their constitutional objections, stated the intervenors joined the lawsuit for the "sole purpose of objecting to the Stipulation on clinical grounds," 645 F.Supp. at 1350.
 
 
 8
 Nevertheless, it is plain from intervenors' 41 comprehensive objections to the proposed stipulation of settlement that the foster care children's constitutional rights were raised. Some objections were addressed, it is true, solely to the administrative unworkability of the settlement. But a number of objections challenged the stipulation's failure to consider adequately the needs of the children served, and its discrimination on equal protection and religious grounds. For example, intervenors alleged
 
 
 9
 9. ... the Stipulation will reduce the level of care provided to all children and families in the system.
 
 
 10
 10. [Twelve paragraphs] taken together authorize provision of their parents' religious beliefs in violation of the First and Fourteenth Amendments to the Constitution of the United States.
 
 
 11
 . . . . .
 
 
 12
 16. The incorporation of ... the Preferred Placement System ... to rank agencies has no place in a federal court order in an action alleging racial and religious discrimination.
 
 
 13
 17. No agency should refuse to provide care to any child by reason of such child's race or religion and SSC shall not permit any agency with which it contracts to do so.
 
 
 14
 . . . . .
 
 
 15
 19. Paragraph 14 improperly treats transfers to more restrictive placements differently from transfers to less restrictive placements although either may be equally sound for different children.
 
 
 16
 Some objections were of a mixed variety, raising issues going to the clinical and administrative interests of the agencies as well as to the best interests, constitutional and otherwise, of the children.
 
 
 17
 Negotiations, in which intervenors then participated, continued through the summer of 1984. In August basic agreement on general topics was reached. The parties continued to negotiate, this time in open court, and in January 1985 a stipulation of settlement was submitted. On October 8, 1986, over the objections of the defendant agencies, the district court approved the stipulation of settlement. On appeal, we affirmed. 848 F.2d 1338.
 
 
 18
 On March 17, 1989 intervenors moved for attorneys' fees as prevailing parties under § 1988. Specifically, they sought from the City fees of $416,052.50, enhanced by a factor of 1.75 for a total of $775,303.50, disbursements of $17,020.59, and continuing City liability for fees related to enforcement of the decree. The City opposed the application, asserting that intervenors were not a prevailing party because they had no federal constitutional or statutory rights within the meaning of 42 U.S.C. § 1988 (1988) at stake in the litigation. The City had already paid plaintiffs $1,775,000 in attorneys' fees and costs pursuant to an offer of judgment submitted by the City in late June 1989, which was accepted by plaintiffs shortly thereafter.
 
 
 19
 In its opinion approving the stipulation of settlement and in its opinion awarding attorneys' fees to intervenors, the district court detailed intervenors' extensive contributions in reaching the settlement finally accepted by all participants, except the defendant agencies. 725 F.Supp. at 1327-29. Because they had "no axes to grind," the district court stated, intervenors were able to measure the proposals according to the best interests of the children and provide it with valuable insights into the clinical and administrative realities of child care. The stipulation of settlement finally adopted, while adhering to the general outline of the original stipulation, was influenced considerably by the concerns aired by intervenors and reflected " 'numerous changes--some minor, some substantial--that address virtually all of the concerns raised by the intervenors.' " 725 F.Supp. at 1329 (quoting 645 F.Supp. at 1348).
 
 
 20
 Given their "comprehensive" and "detailed" efforts, their "integral and essential role," and their "significant impact" on the creation of a remedy that vindicated the civil rights of the children and their families in the foster care system, the district court held that the intervenors were therefore prevailing parties entitled to an award of attorneys' fees and costs. It disagreed with intervenors' computation of those fees and denied their request for an enhancement factor. Instead it awarded fees in the amount of $355,388.85 and disbursements of $10,212.35. It is from that decision that the City appealed. We now remand the question of the amount of the award of attorneys' fees to the district court.
 
 DISCUSSION
 A. An Intervenor May Be a Prevailing Party
 
 21
 The City challenges the trial court's threshold conclusion that intervenors were a prevailing party and thus eligible for attorneys' fees under 42 U.S.C. § 1988. We begin with the American Rule that declares no attorneys' fees are recoverable absent express statutory authority for such an award. See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 561-62, 106 S.Ct. 3088, 3096-97, 92 L.Ed.2d 439 (1986). Unless Congress empowers it, a federal court has no authority to award attorneys' fees to prevailing parties. See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 269, 95 S.Ct. 1612, 1627, 44 L.Ed.2d 141 (1975). Hence, our task is to determine whether Congress in enacting § 1988 contemplated an award of attorneys' fees in the present circumstances.
 
 
 22
 We turn to that statute, which states in pertinent part:
 
 
 23
 In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92-318, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.
 
 
 24
 42 U.S.C. § 1988 (Act). Section 1988 is analyzed in the same manner as other similarly worded fee-shifting statutes. See Indep. Fed'n of Flight Attendants v. Zipes, 491 U.S. 754, 758 n. 2, 109 S.Ct. 2732, 2735 n. 2, 105 L.Ed.2d 639 (1989) (substantially similar language found in 42 U.S.C. § 2000e-5(k), 42 U.S.C. § 2000a-3(b), and 42 U.S.C. § 1988 "is 'a strong indication' that they are to be interpreted alike"). "The touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." Texas State Teachers Ass'n v. Garland Indep. School Dist., 489 U.S. 782, 792-93, 109 S.Ct. 1486, 1493-94, 103 L.Ed.2d 866 (1989). Parties have "prevailed" for purposes of shifting attorneys' fees " 'if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the action.' " Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) (quoting Nadeau v. Helgemoe, 581 F.2d 275, 278-79 (1st Cir.1978)).
 
 
 25
 Although the statute expressly conditions the award of attorneys' fees upon the discretion of the court, the effect of this language has been interpreted to create a strong preference in favor of the prevailing party's right to fee shifting. Therefore, "[a] party seeking to enforce the rights protected by the statutes covered by [§ 1988], if successful, 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.' " S.Rep. No. 1011, 94th Cong., 2d Sess. 4, reprinted in 1976 U.S.Code Cong. & Admin.News 5908, 5912 (Senate Report) (quoting Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968)). This same section of the legislative history of § 1988 specifically contemplates that an intervenor may be a prevailing party. "In the large majority of cases the party or parties seeking to enforce such rights will be the plaintiffs and/or plaintiff-intervenors. However, in the procedural posture of some cases, the parties seeking to enforce such rights may be the defendants and/or defendant-intervenors." Id. at 4 n. 4, reprinted in 1976 U.S.Code Cong. & Admin.News at 5912 n. 4.
 
 
 26
 The fact that a claim has been resolved by settlement, as in this case, does not preclude a finding that intervenors are prevailing parties; it is plain that a party may prevail when it vindicates rights--regardless of whether there is a formal judgment--through a settlement or consent judgment. See, e.g., Hewitt v. Helms, 482 U.S. 755, 760-61, 107 S.Ct. 2672, 2675-76, 96 L.Ed.2d 654 (1987); Maher v. Gagne, 448 U.S. 122, 129, 100 S.Ct. 2570, 2577, 65 L.Ed.2d 653 (1980); Koster v. Perales, 903 F.2d 131, 134 (2d Cir.1990); Senate Report at 5, reprinted in 1976 U.S.Code Cong. & Admin.News at 5912.
 
 
 27
 Actions alleging civil rights violations traditionally seek injunctive relief directly affecting not only the plaintiffs, but also certain non-participants and less directly the public at large. In addition to permitting non-participants to protect their implicated interests, intervention furthers the goals of efficiency and uniformity. To forbid the shifting of attorneys' fees to intervenors, who could otherwise bring a separate action later as plaintiffs alleging the same civil rights violations--even, as in this case, those that persist after entry of a proposed consent settlement--defeats the goal of judicial economy. Hence, there is no reason why the present intervenors, whether they be styled intervenor-plaintiffs or intervenor-defendants, may not be prevailing parties for purposes of § 1988.
 
 
 28
 B. Present Intervenors are Prevailing Parties
 
 
 29
 The next question to be addressed is whether the present agency intervenors are such prevailing parties. In awarding attorneys' fees, the district court found that as a result of intervenors' efforts the settlement was modified in ways that directly benefited the children in the child care system, and it concluded that a material alteration of the legal relationship of the parties in a manner that Congress sought to promote in § 1988 had therefore been effected. 725 F.Supp. at 1332.
 
 
 30
 Appellant City does not dispute the fact that appellees' input was helpful to children in the child care system, but it contends that contributions to a settlement, no matter how important or helpful, do not entitle these intervenors to attorneys' fees. Something more is needed, the City insists, before an award may be made under § 1988, that is, the party seeking an award must assert a violation of its own rights under the applicable civil rights statutes. Because intervenors asserted no such right, the City concludes, they may not be considered prevailing parties. Careful analysis of the statute's language, rules, legislative history and decisional law construing § 1988 does not support the City's view of the statute.
 
 
 31
 We begin by reviewing the language of that statute, United States v. James, 478 U.S. 597, 604, 106 S.Ct. 3116, 3120, 92 L.Ed.2d 483 (1986), and assume the ordinary meaning of the language used expresses Congress' purpose. American Tobacco Co. v. Patterson, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982). Section 1988 expressly permits fees to be shifted to parties who prevail in certain enumerated civil rights actions. A limitation that only parties who prevail in vindicating their own civil rights may be awarded attorneys' fees is not found in the Act and such a reading of § 1988 does not comport with its plain and ordinary meaning.
 
 
 32
 At the same time we recognize that there are limitations on who may intervene in a civil rights suit. Either the applicant must have an interest implicated by the underlying suit that might be impaired, one which is not adequately represented by the original parties to the action, Fed.R.Civ.P.Rule 24(a)(2), or its "claim or defense and the main action [must] have a question of law or fact in common." Fed.R.Civ.P. Rule 24(b)(2). Rule 24 does not permit just any interested person to intervene and become a party to a suit. Since § 1988 extends fees only to prevailing parties in the action or proceeding, see Morales v. Turman, 820 F.2d 728, 732 (5th Cir.1987) (amicus curiae, without intervention or standing, never participated as "party" in proceeding and is not entitled to fees despite providing beneficial input to remedy), ruling that present intervenors are prevailing parties will not open the flood-gates to amicus curiae, good samaritans, or even litigious meddlers so that they may "team up" and overburden the nonprevailing party with excessive attorneys' fees. Rule 24 permits intervention in a civil rights action therefore not only to parties alleging violations of their own civil rights, but also to intervening parties alleging violations of the civil rights of individuals to whom they owe some duty or have a legal obligation to protect.
 
 
 33
 Considering next the legislative history, it may arguably be asserted from certain references that fee shifting is intended for the victims who vindicate their own civil rights. See, e.g., Senate Report at 2, reprinted in 1976 U.S.Code Cong. & Admin.News at 5910 ("If private citizens are to be able to assert their civil rights ... then citizens must have the opportunity to recover what it costs them to vindicate these rights in court") (emphasis added); H.R.Rep. No. 1588, 94th Cong., 2d Sess. 1 (1976) (act designed to grant effective access to courts for the majority of victims of civil rights violations who are unable financially to vindicate their rights).
 
 
 34
 Yet, it would be relying on a very slim reed indeed were we to limit the plain text of a statute because of two references found in its legislative history. Neither reference purports to limit the scope of the Act's effect, and each uses only general wording that applies to fee-shifting in the typical case. The omission of a reference in that history to the rights of third parties, those permitted to assert the rights of others through the law of jus tertii, or associational standing, is not dispositive; and, to place significance on it reads the cited legislative reports out of context. The legislative history does not express an intent so clearly contrary to the statute that it can support a conclusion more limited than the ordinary meaning of the statutory language used, one, moreover, in conflict with the broad remedial purpose of § 1988. See Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).
 
 
 35
 Instead, Congress aimed under the Act "to use the broadest and most effective remedies" to ensure that the objectives of the civil rights laws are attained. See Senate Report at 3, reprinted in 1976 U.S.Code Cong. & Admin.News at 5910. One way to accomplish that purpose is to promote the private enforcement of civil rights by encouraging litigants to act as "private attorneys general." The legislature recognized that inadequate resources of the enforcement division of the executive branch prevented it from eradicating all civil rights abuses solely through the government's efforts. Shifting attorneys' fees enabled Congress to promote vigorous enforcement of its civil rights policies, while limiting the growth of the bureaucracy charged with its administration. Again, Congress was aware that victims of civil rights violations usually are not wealthy people and "[t]he organizations who have helped them bring their cases are frequently not well financed." Donnell v. United States, 682 F.2d 240, 246 (D.C.Cir.1982), cert. denied, 459 U.S. 1204, 103 S.Ct. 1190, 75 L.Ed.2d 436 (1983) (quoting 122 Cong.Rec. 35127 (October 1, 1976) (remarks of Rep. Holtzman)) (emphasis added). In fact, the Senate Report in its entirety stands as a singularly lucid pronouncement that the award of attorneys' fees made under § 1988 should be interpreted broadly so as to avoid frustrating enforcement of fundamental laws.
 
 
 36
 Thus, intervenors may act effectively as private attorneys general in vindicating abuses of civil rights, and where they have "contributed importantly to the creation of remedies," we and other courts have held they are entitled to an award of attorneys' fees. See United States v. Board of Educ. of Waterbury, 605 F.2d 573, 576 (2d Cir.1979). See also Grove v. Mead School Dist. No. 354, 753 F.2d 1528, 1535 (9th Cir.), cert. denied, 474 U.S. 826, 106 S.Ct. 85, 88 L.Ed.2d 70 (1985) ("[a]wards to intervenors should not be granted unless the intervenor plays a significant role in the litigation"); Miller v. Staats, 706 F.2d 336, 340-42 (D.C.Cir.1983) (intervenors who allege a colorable civil rights claim may be entitled to attorneys' fees); Donnell, 682 F.2d at 247 (fees may be awarded to intervenors in a successful suit if they played a significant role in producing the outcome).
 
 
 37
 Waterbury presents analogous facts instructive on the resolution of the present case. There the intervenor was not the school children whose civil rights were implicated in the underlying school desegregation case, but was an organization consisting of Hispanic community leaders, individuals, and parents of some of the students. Waterbury, 605 F.2d at 574. In the foster care context presented here, the intervenor child care agencies have similar in loco parentis duties running to the children in their care, see New York Soc.Serv.Law §§ 383-384 (McKinney 1983 & Supp.1991); cf. 42 U.S.C. § 675(5)(A) (1988). In both cases, the intervenor group's constituency included the plaintiff class of children asserting a civil rights interest.
 
 
 38
 For many would be intervenors, the availability of such a remedy would be a hollow one were the recovery of attorneys' fees not to exist as an incentive. See Senate Report at 3, reprinted in 1976 U.S.Code Cong. & Admin.News at 5910; Tamanaha, The Cost of Preserving Rights: Attorneys' Fee Awards and Intervenors in Civil Rights Litigation, 19 Harv.C.R.-C.L.L.Rev. 109, 118-20 (1984). Although capable of acting as effective private attorneys general, many potential parties would never intervene in civil rights actions because they, and the constituencies they represent, are economically disadvantaged. See Tamanaha, supra, at 143-44 n. 130. In addition to duplicating effectively the limitations on joining actions imposed by Rule 24, a narrow interpretation of § 1988 thwarts the fashioning of appropriate injunctive relief. Without the valuable perspective of those who might properly intervene--but for their financial inability--a reconciliation of the diverse community interests of those affected is frustrated. See Waterbury, 605 F.2d at 576.
 
 
 39
 Consequently, because implicated interests or common legal or factual questions involved violations of civil rights protected by the Constitution or federal statutes enumerated under § 1988, and because the efforts of the intervenors contributed importantly to the creation of remedies Congress sought to advance in the fee statute, the present intervenors properly were held to be prevailing parties entitled to an award of attorneys' fees.
 
 
 40
 C. Computation of Intervenors' Attorneys' Fees Award
 
 
 41
 How to disentangle the numerous objections to the settlement and decide which are subject to an award and which are not is the remaining question. Rule 24, as earlier noted, requires that a minimum nexus or connection be present between the intervening party whose interests are implicated and the original parties to the action. Given that the relationship between the intervenors in this case and the children entrusted in their care provided a sufficient nexus, our inquiry turns to whether intervenors' efforts effected the requisite "material alteration" as envisioned by Congress in § 1988, see Texas State Teachers Ass'n, 489 U.S. at 793, 109 S.Ct. at 1494, that is, whether intervenors' "participation contributed importantly to the creation of remedies." Waterbury, 605 F.2d at 576.
 
 
 42
 In answering that inquiry the following discussion should be helpful. First, efforts by counsel for intervenors that merely duplicate those of the plaintiffs in effectuating the foster care children's civil rights should not result in an award of attorneys' fees. See Grove, 753 F.2d at 1535; Donnell, 682 F.2d at 247-48 (where "the intervenor contributed little or nothing of substance in producing the outcome, then fees should not be awarded"). See also Alabama Power Co. v. Gorsuch, 672 F.2d 1 (D.C.Cir.1982); Seattle Sch. Dist. No. 1 v. Washington, 633 F.2d 1338 (9th Cir.1980), aff'd, 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982). The plaintiffs in a civil rights action have the priority claim for an award of fees as prevailing parties where their efforts have effectuated some or all of the civil rights involved in the litigation. The policies underlying private attorneys general and intervention are not so compelling when a suit has already been initiated and the potential intervenor's interests are adequately represented. Otherwise there would be a temptation to load up unnecessarily on intervenors in civil rights actions to compel defendants to settle because of the potential exposure to large legal fees.
 
 
 43
 The legal efforts of a plaintiff, on the other hand, may be legally deficient in a particular case or, at least, on some issues in the case. Hence, second, when nonduplicative efforts by intervenors effectuate the civil rights at issue they are entitled to an award because such a result furthers the purpose of the civil rights statutes in a fashion envisioned by Congress. For instance, where intervenors prevail in demonstrating that constitutional infirmities persisted under a proposed stipulation agreed to by plaintiffs, as occurred in the present case, their efforts probably would not be considered duplicative. Whether there was duplication of effort, nevertheless, is a question to be resolved by the district court.
 
 
 44
 Third, it follows that parties whose intervention produces results that are unrelated to remedying violations of civil rights are not eligible for attorneys' fees. Section 1988 is expressly limited to suits to enforce specified civil rights provisions. Section 1988 therefore would not apply to an intervenor who prevails upon a non-civil rights claim because no "material alteration of the legal relationship ... in a manner which Congress sought to promote" has been achieved. Texas State Teachers Ass'n, 489 U.S. at 793, 109 S.Ct. at 1494 (emphasis added).
 
 
 45
 We recognize there will be situations where efforts expended on separate issues likely will be difficult to sort out. Questions of duplication and mixed motives are further clouded when litigation is resolved through settlement, when intervening parties object to a proposed settlement agreed to by the original plaintiffs, and still further in a case such as the instant one where all the parties claim to be acting in the foster children's best interests. Courts nevertheless must take care not to shift attorneys' fees in a manner Congress did not envision. In Waterbury, we noted that complex civil rights cases require a court to be flexible when using its discretion in awarding attorneys' fees to ensure that Congress' aim in enacting these statutes is realized. Waterbury, 605 F.2d at 576.
 
 
 46
 As a consequence, we hold finally that where a party has mixed motives for intervening, each of which are permissible grounds for intervening, and the intervening party prevails, the non-duplicative attorneys' fees attributable to the efforts expended in pursuit of civil rights remedies may be recovered. And, where the efforts that furthered civil rights objectives concomitantly advanced non-civil rights concerns, for example, administrative and clinical concerns, attorneys' fees may also be awarded. Any adjustment in the fee award based upon the extent to which a party's participation contributed to the ultimate remedy, including considerations of duplication and motivations other than civil rights, rests appropriately in the district court's sound discretion.
 
 CONCLUSION
 
 47
 The district court awarded attorneys' fees to intervenors because the 19 nondefendant child care agencies prevailed on civil rights claims as well as clinical and administrative objections to the proposed stipulation. It did not discuss to what degree the work of intervenors' counsel may have been duplicative with that expended by plaintiffs' counsel, or what portion of that work can be attributed solely to advancing concerns other than civil rights violations. For these determinations, and any corresponding changes in the fee award they might merit, we remand the instant matter to the district court for further proceedings in accordance with this opinion.
 
 
 
 [1]
 The intervenors group consists of the following agencies: Abbott House, Berkshire Farm Center & Services for Children, Brooklyn Home for Children, Brookwood Child Care, The Children's Aid Society, The Children's Village, Episcopal Mission Society, Green Chimneys Children's Service, Heartsease Home, Inc., Inwood House, Lakeside School, Louise Wise Services, Lutheran Community Services, Puerto Rican Family Association, St. Christopher-Jennie Clarkson Child Care Services, Sheltering Arms Children's Service, Society for Seamen's Children, Spence-Chapin Service to Children, and Talbot Perkins Children's Services